J-S62013-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF:  D.M., S.S. AND M.M., MINORS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  P.M., MOTHER | No. 665 WDA 2015 |

Appeal from the Order Entered April 1, 2015
in the Court of Common Pleas of Allegheny County
Family Court at No.: TPR 111 of 2013

| | |
|---|---|
| IN THE INTEREST OF:  D.M., S.S. AND M.M., MINORS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  P.M., MOTHER | No. 666 WDA 2015 |

Appeal from the Order Entered April 1, 2015
in the Court of Common Pleas of Allegheny County
Family Court at No.: TPR 113 of 2013

J-S62013-15

| IN THE INTEREST OF: D.M., S.S. AND M.M., MINORS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: P.M., MOTHER | |
| | No. 667 WDA 2015 |

Appeal from the Order Entered April 1, 2015
in the Court of Common Pleas of Allegheny County
Civil Division at No.: TPR 112 of 2013

BEFORE: GANTMAN, P.J., JENKINS, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED DECEMBER 29, 2015**

In these consolidated appeals,[1] P.M. (Mother) appeals the orders of

the Court of Common Pleas of Allegheny County, entered April 1, 2015, that

terminated her parental rights to her son, D.M., born in October of 2006, her

daughter, M.M., born in March of 2005, and her daughter S.S., born in

November of 2010 (Children). We affirm.[2]

Allegheny County Office of Children, Youth and Families (CYF) first

became involved with this family in January of 2006. At that time, CYF

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] This Court consolidated these appeals, *sua sponte*, on May 22, 2015.

[2] The trial court also terminated the parental rights of D.M.'s father, W.L., M.M.'s father, A.G., and S.S.' father, T.S., as well as each Child's unknown father. None of these individuals has filed an appeal.

received reports of inadequate housing, medical neglect, and physical abuse of the Children by Mother. The agency received another referral in July of 2006 for similar issues and a report that the utilities where the family was living had been shut off. Mother worked with In-Home Services (IHS) during this time while the Children remained in the home. CYF received subsequent, similar referrals in November of 2007, April of 2008, July of 2008, January of 2009, February of 2009, July of 2009, August of 2009, and January of 2010. Mother was incarcerated on a number of occasions during this period.

CYF developed a Family Service Plan (FSP) in 2008 that set Mother's goals as: (1) obtain stable housing; (2) attend parenting classes; (3) address her mental health; (4) address the Children's medical needs; and (5) learn to live within a budget.

CYF received a referral in February of 2011 that Mother was living in a friend's basement with the Children and T.S., the father of S.S. CYF implemented IHS at a crisis level and was able to assist Mother in finding housing in March of 2011.

Mother was incarcerated again in April of 2011 and the Children were left in the care of T.S.[3] T.S. left two of the children, D.M. and M.M., with Maternal Grandmother a few weeks later and continued to care for S.S.

---

[3] Mother was sentenced to serve not less than eighteen months nor more than thirty-six months in a state correctional facility.

Upon learning of this, CYF filed dependency petitions for all three of the Children. The trial court adjudicated D.M. and M.M. dependent on July 6, 2011. The dependency for S.S. was continued because she was in T.S.' care and deemed to be in stable housing. S.S. was removed from T.S.' care two weeks later; the trial court adjudicated her dependent in August of 2011. S.S. remained in foster care until placed in the care of Maternal Grandmother in January of 2012.

New goals were implemented for Mother in 2011 that included maintaining contact with CYF and other service providers, attending parenting classes, securing housing, properly supervising the Children, seeking mental health treatment, pursuing visitation, meeting the Children's education and medical needs, maintaining recovery from substance abuse, completing an anger management course, and following all recommendations. Mother was able to complete some programs and visit with the Children during her incarceration.[4]

Mother was released to a halfway house in September of 2012, and back into the community in October of 2012. When Mother was released back into the community, she began to visit with the Children at Maternal Grandmother's home. After a short period of weekly visits, Mother began to appear at the home on a daily basis and the visits had to be moved to the

---

[4] We find nothing in the record to indicate that Mother's incarceration, in and of itself, contributed to her inability or refusal to parent the Children.

CYF office. Regular visits occurred until December of 2013, at which time Mother was again incarcerated. She was released to Gateway Sheffield in February of 2014 and began visiting the Children at that facility. Visits resumed at the CYF office upon her release from that program in June of 2014. During these visits, Mother would talk about the case in front of the Children and was often confrontational with staff. Mother has only attended about half of her scheduled visits.

Psychologist, Neil Rosenblum, Ph.D., conducted evaluations of the family in 2011, 2012, 2013, and 2014. In the 2011 evaluations, Dr. Rosenblum noted that the Children appeared to have a good relationship with Maternal Grandmother and her paramour and were comfortable in her presence. The doctor noted that Maternal Grandmother had physical limitations that affected her play with the Children but that she engaged in play as much as she could. Dr. Rosenblum expressed concerns that M.M. was often torn between Mother and Maternal Grandmother and exhibited signs of deprivation and emotional insecurity. In the 2012 evaluations, Dr. Rosenblum noted that M.M. was doing well in Maternal Grandmother's care and that S.S. appeared much more comfortable after being placed with Maternal Grandmother. The subsequent evaluations did not reveal any new or additional information and the Children continued to do well in Maternal Grandmother's home. At the final hearing in this matter, on February 6, 2015, Dr. Rosenblum testified:

[M]y conclusions are that the [C]hildren have been in care at the time of this evaluation three years now, closer to four years. They have maintained stability, continuity of care. They have developed healthy, constructive relationships with [Maternal Grandmother and her paramour] and view them as their psychological parent figures, as I just said.

In contrast, [Mother] was away for a year or more. I forget exactly. But since her return to the community in the fall of 2012, I see no ability on [M]other's part to develop a more constructive pattern of adjustment. She has not used mental health counseling consistently, or to gain insight into the problems, adjustment problems and lifestyle and behavior difficulties which she continues to address at this time.

\*   \*   \*

[The Children] need a sense of closure and ability to feel safe on a long-term, permanent basis with where they are going to reside and who they are going to look to as their parent figures. I don't have any confidence that [M]other is going to achieve a more stable pattern of adjustment in the near future, for the foreseeable future, and as a result, I would strongly recommend that a goal change to adoption is consistent with the [C]hildren's needs and welfare.

(N.T. Hearing, 2/06/15, at 24-25).

CYF filed its petitions to terminate Mother's parental rights on June 27, 2013. The trial court held hearings on those petitions on May 2, 2014, June 6, 2014, September 19, 2014, and February 6, 2015. The trial court entered its orders terminating Mother's parental rights, and the parental rights of the Children's fathers and unknown fathers, pursuant to 23 Pa.C.S.A. §§ 2511 (a)(2), (5), (8) and (b), on April 1, 2015. Mother filed

her notices of appeal and statements of errors complained of on appeal on April 28, 2015. *See* Pa.R.A.P. 1925(a)(2)(i).[5]

Mother raises the following questions on appeal:

I. Whether the [t]rial [c]ourt committed reversible error in finding the Office of Children, Youth and Families met it's [sic] burden of proof and proved by clear and convincing evidence that the parental rights of [Mother] should be terminated pursuant to 23 Pa C.S.A. 2511(a)(1), (2), (5), and (8)?

II. Whether the [t]rial [c]ourt committed reversible error in finding the Office of Children, Youth and Families met its burden of proof and proved by clear and convincing evidence that the parental rights of [Mother] should be terminated pursuant to 23 Pa C.S.A. 2511(b) and that said termination best meets the needs and welfare of the children?

(Mother's Brief, at 1).

Our standard of review is as follows:

. . . In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

_____

[5] The trial court entered an opinion on June 2, 2015. *See* Pa.R.A.P. 1925(a).

> Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

> > We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the

- 8 -

incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citations and internal quotation marks omitted). Further,

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In the Interest of K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

In regard to incarcerated persons, our Supreme Court has stated:

> [I]ncarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.
>
> *        *        *
>
> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

*In re Adoption of S.P.*, 47 A.3d 817, 828, 830-31 (Pa. 2012) (case citations omitted).

The Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The Act does not make specific reference to an evaluation of the bond between parent and child but our case law requires the evaluation of any such bond. *See In re E.M.*, 620

- 10 -

A.2d 48, 485 (Pa. 1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. *See In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008).

In her brief, Mother first argues, "[Mother] maintains that [CYF] failed to provide reasonable services to Mother to assist in her reunification with her children." (Mother's Brief, at 3; *see id.* at 5-9). Mother's claim lacks merit because nothing in our law required CYF to provide "reasonable services" to Mother.

In *In the Interest of D.C.D.*, our Supreme Court stated:

> Neither Father nor the Superior Court point to any Pennsylvania or federal provision that requires delaying permanency for a child due to the failure of an agency to provide reasonable services, when a court has otherwise held that grounds for termination have been established and the court has determined that termination is in the best interests of the child by clear and convincing evidence. Accordingly, we conclude that the Superior Court erred in reversing the trial court's termination of Father's parental rights as a result of CYS's failure to provide reasonable efforts to enable Father to reunify with Child.

*In the Interest of D.C.D.*, 105 A.3d 662, 676 (Pa. 2014).

In the case before us, the trial court has determined that CYF has met its burden of demonstrating that Mother's parental rights should be terminated pursuant to section (a). Thus, our focus must be on whether the record in this case supports the trial court's determination, and not on the services CYF provided to Mother. We quote the trial court's analysis of section (a) with approval:

With regard to grounds under § 2511([a]) the [C]hildren have been out of Mother's care for a period in excess of 12 months at the time the TPR Petition was filed. All of the conditions that existed at the time of removal continue to exist.

During Dr. Rosenblum's evaluations of Mother, she was confrontational and did not take ownership of her problems. She admitted that she needed to address her issues with housing and employment but focused most of her energy complaining about the caseworker and [Maternal Grandmother]. He ultimately opined that the [C]hildren have not relied on [Mother] to meet their needs for some time. Mother has consistently articulated that the [C]hildren should never have been removed from her care and projected blame for this onto both the caseworker and [Maternal Grandmother]. It was the opinion of Dr. Rosenblum that Mother had not made any meaningful progress since the case had been opened, that her behavior had not changed, she had failed to attend mental health treatment, had been arrested on new criminal charges and consistently displayed patterns of anger, defensiveness, projection of blame and has refused to take responsibility for her actions. Mother's failure to attend treatment consistently has prevented her from gaining any insight into the issues that caused [the C]hildren to come into care.

Mother has made limited progress on her FSP goals and her only substantial periods of compliance occurred while she was incarcerated. She did complete some parenting and anger management classes. To her credit, Mother has always maintained contact with [CYF] and attended court hearings, but her visits never went to unsupervised due to her lack of progress. The issues that have kept the case open for the last several years have been Mother's mental health and her lack of progress on her goals while in the community. Her behavior at visits and in front of the [C]hildren has been a constant concern. She has had frequent outbursts and has spoken negatively about Maternal Grandmother on numerous occasions to the [C]hildren. She has engaged in verbal altercations with Grandmother and has accused her of not taking care of the [C]hildren in an appropriate manner. Stable housing has also been a concern throughout the history of the case. Mother has moved in excess of eight times since 2011. None of these residences have ever been acceptable for the return of the [C]hildren.

The [c]ourt has recognized that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. The [c]ourt cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claim of progress and hope for the future. Mother has done little to remedy the conditions which brought the [C]hildren into care. [The C]hildren have been continuously exposed to conflict and animosity between Mother and [Maternal] Grandmother over their care. Mother has minimized her lack of progress and instead focused on [Maternal] Grandmother's lack of hair styling experience. She has complained repeatedly that the [C]hildren's hair and clothing were not up to her standards. She has confronted both [Maternal] Grandmother and the case worker about it on numerous occasions. She has complained about it at nearly every hearing. This is indicative of Mother's inability to take ownership of the reasons why the [C]hildren were taken into care. She has not put nearly as much energy into progressing in her FSP goals. Mother has been incarcerated several times for various convictions and parole violations. She has never maintained stable housing or employment. It was the opinion of Doctor Rosenblum that Mother would never be able to achieve an extended period of stability and that termination would best suit the needs and welfare of the [C]hildren.

(Trial Court Opinion, 6/02/15, at 6-7) (citation omitted).

Our examination of the record reveals that CYF presented clear and convincing evidence that supports the trial court's determination. Mother's first claim is without merit.

In her second issue, Mother challenges the trial court's determination that termination is in the best interests of the Children. (*See* Mother's Brief, at 10-26). She addresses the question of the best interests and welfare of the Children by focusing primarily on such things as the way Maternal Grandmother cares for the Children's hair, Maternal Grandmother's age, and the quality of the relationship between herself and Maternal Grandmother.

- 13 -

(*See id.* at 13, 18, 20-23). She does not explain how these issues affect the best interests and welfare of the Children.

Dr. Rosenblum described Maternal Grandmother and her paramour as, "the people [the Children] look to that meet their needs on a day in, day out basis. I use the term some times that they are their psychological parents." (N.T. Hearing, 2/06/15, at 23). He concluded by opining:

> [The Children] need a sense of closure and ability to feel safe on a long-term, permanent basis with where they are going to reside and who they are going to look to as their parent figures. I don't have any confidence that [M]other is going to achieve a more stable pattern of adjustment in the near future, for the foreseeable future, and as a result, I would strongly recommend that a goal change to adoption is consistent with the [C]hildren's needs and welfare.

(*Id.* at 25).

Our examination of the record reveals that it supports the trial court's finding regarding the Children's best interests and welfare:

> The [C]hildren have adjusted well in [Maternal] Grandmother's care despite Mother's behaviors but are surely in need of a firm understanding that they will remain with [Maternal] Grandmother and her paramour for the duration of their childhood. The [C]hildren have built a primary attachment with [Maternal] Grandmother and her paramour. The [C]hildren have a strong bond with them and look to them for stability and security. Termination best serves the developmental, physical and emotional needs and welfare of the [C]hildren.

(Trial Ct. Op. at, at 7-8). Mother's second claim is without merit.

Accordingly, for the reasons stated, we affirm the orders of the Court of Common Pleas of Allegheny County that terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

- 14 -

Orders affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/29/2015