J-A04044-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.R.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M.S., III, FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1435 MDA 2024 |

Appeal from the Decree Entered September 3, 2024
In the Court of Common Pleas of York County
Orphans' Court at No(s):  2024-0017a

BEFORE:  LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:          **FILED: APRIL 7, 2025**

J.M.S., III ("Father") appeals from the decree involuntarily terminating his parental rights to his daughter A.R.M.M (born in November 2017) ("Child"). We affirm.

The relevant factual and procedural history of this case is as follows: Father and N.M. ("Mother") engaged in sexual relations in early 2017—though Mother had several paramours—and Mother became pregnant that year with Child.  *See* N.T., 9/3/24, at 52.  Father knew Mother was pregnant with Child, and he knew he could have been Child's father prior to her birth.  *See id*. However, Father took no steps to confirm or disconfirm his paternity.  *See id*. Father was in communication with Mother during her pregnancy, and he went to a doctor's appointment for an ultrasound in 2017, following Mother's request.  *See id*. at 54.  Child was born in November 2017.  Father was incarcerated at some unspecified time in 2017 through 2019, and from

January 26, 2020 through at least January 2025.[1] Following Child's birth, Father took no steps to determine whether he was Child's father or to pursue custody of Child, including during the periods when he was incarcerated as well as his approximately four-month period of time outside of prison from 2019-2020. *See id*. at 53.

Child came to the attention of York County Office of Children, Youth and Families ("CYF") in January 2023 following a referral for a sibling. *See id*. at 12. Child was placed into CYF's custody in January 2023 and has remained there since. *See id*. at 12-13. Her total time of placement, and adjudication of dependency, as of September 2024 was approximately eighteen to nineteen months. *See id*. at 13.

At the time of CYF's involvement with Child, Mother identified Child's father as "J.S.," but otherwise gave inaccurate information about Father to CYF; however, she later provided Father's information and location to CYF. *See id*. at 12.[2] Beginning in April 2024, CYF reached out to Father and spoke

_____

[1] Father indicated he received convictions for possession of a firearm, theft from a motor vehicle, and receiving stolen property, resulting in his incarceration from January 2020 on. *See* N.T., 9/3/24, at 51. He testified he received a six-to-fifteen-year prison sentence, which would put his minimum release date in January 2026, though he indicated he believed he could be released a year earlier for good behavior and RRRI eligibility. *See id*. at 57, 62. There was no evidence of Father's potential release date admitted at the hearing apart from his testimony.

[2] CYF previously filed a petition to terminate Mother's and J.S.'s parental rights in February 2024. The petition initially listed J.S. as the putative father. *See*
*(Footnote Continued Next Page)*

to him about Child and informed him of Child's existence; Father told CYF he knew that Child existed, acknowledged he had had sex with mother; and stated he did not know whether Child was his, and he did not have a good rapport with Mother. *See id*. at 7-8. Since CYF contacted Father, he made no contact with Child. *See id*. at 8. CYF caseworker Lashanda Kitt ("Ms. Kitt") testified that prior to, and since, Father's communication with CYF, he had provided no financial support for Child; he sent no gifts, cards, or letters *via* CYF; he had no visitation with Child; he had no phone calls with Child; Child does not know who Father is, and neither would recognize the other if they saw each other. *See id*. at 16-17.[3] Father requested no services from CYF. *See id*. at 17. He performed no parental duties, nor did he file for custody or attempt to ascertain Child's location. *See id*. Ms. Kitt testified that Father showed no interest in Child even after his paternity was established conclusively. *See id*. Father initiated no contact with CYF. *See id*.

---

Pet., 2/6/24, at 3. The other J.S. and Father have the same last name, and the other J.S.'s first name is the longer form of which Father's name is a diminutive. In April 2024, Mother's parental rights were terminated, **see** Decree, 4/29/24, and she did not appeal. However, J.S. was determined not to be the father of Child. **See** Order 4/23/24. Shortly thereafter, Mother gave additional information to CYF about Father.

[3] The trial court, in May 2024, changed Child's primary from reunification to adoption with a concurrent goal of placement with a legal custodian. Father appealed the goal change order, and a panel of this Court affirmed. **See Interest of A.M.**, 328 A.3d 517 (Pa. Super. 2024) (unpublished memorandum).

Father conceded he was allowed to send eight free letter per month from prison, but he sent no letters to CYF following their contact in April to May of 2024. *See id*. at 70. Father also acknowledged he received court-appointed counsel in May 2024 for this matter, yet he sent no letters to his attorney requesting contact with Child or asking about how to contact her. *See id*. at 71.[4] He also made no efforts to call Ms. Kitt despite being able to put her phone number on a call list. *See id*. at 71-72. Following appointment of counsel, Father waited approximately four months before inquiring *via* mail of his attorney how he could contact Child "[b]ecause I was busy doing my programming" in prison, *see id*. at 72-73; however, he admitted he had had phone contact with his attorney as well. *See id*. at 73.

Following her adjudication, Child was ultimately placed in a pre-adoptive home. *See id*. at 17. By September 2024, she had been there for fourteen months. *See id*. at 74. According to testimony by her foster mother, R.F., Child is in first grade, she goes to weekly therapy and semi-weekly neurofeedback, and is doing well with those services. *See id*. at 75-76. R.F. has no problems with Child's behavior, and Child is up to date with her medical appointments, and R.F. and her husband provide for Child's daily needs. *See id*. at 76. R.F. and her husband are pre-adoptive resources for Child. *See id*. R.F. has received no financial support or contact from Father, though she

---

[4] As noted above, Father appealed the goal change order, which this Court affirmed. *See supra* n.3.

would allow Child's biological parents to contact Child. *See id*. at 76-77. Additionally, Ms. Kitt opined that it was in Child's best interests for Father's paternal rights to be terminated because Child does not know who Father is; and Father is unable to provide safe and stable housing for himself. *See id*. at 18.

CYF filed a petition to terminate Father's parental rights in April 2024, and seeking termination pursuant to section 2511(a)(1), (2), (5), (8), and (b). *See* Pet., 4/25/24. Subsequently, Father's mother submitted to a DNA test which confirmed Father's paternity in July 2024. *See* N.T., 9/3/24, at 37-39.[5]

The trial court held a hearing in September 2024 at which it heard the testimony summarized above. At the hearing, Child was represented by her court-appointed legal counsel, Katherine Doucette, Esq. ("Attorney Doucette"), and her guardian *ad litem* ("GAL"), Andrea Fitzsimmons, Esq., also participated in the hearing. Father, who was represented by counsel, also appeared and gave testimony. Child's counsel, Attorney Doucette, informed the court that Child did not understand "exactly what termination means," but "she didn't want to have a relationship with [Father] . . . because

---

[5] Father's mother had received some communications from Mother about Child in August 2023 including pictures; and while she believed Father could have been Child's father, she was skeptical, and testified she had no discussions with Father about Child. *See* N.T., 9/3/24, at 38-39, 43-46.

she doesn't know him." N.T., 9/3/24, at 80. Attorney Doucette, based on her discussions with Child, advocated for termination of Father's parental rights. *See id*. at 80-81. Child's GAL, Attorney Fitzimmons, likewise opined that termination was warranted and in Child's best interests. *See id*. at 81. At the conclusion of the hearing, the trial court terminated Father's parental rights pursuant to section 2511(a)(1), (2), and (b). Father timely appealed and both he and the trial court complied with Pa.R.A.P. 1925.

Father raises the following issue for our review:

Did the lower court err as a matter of law and/or abuse its discretion in terminating Father's parental rights under [section] 2511(a)(1), (2) and (b)[,] as Father did not know or ha[ve] sufficient reason to know he had a child until after [CYF] filed for termination?

Father's Br. at 5 (unnecessary capitalization omitted).

Our standard of review is for an error of law or abuse of discretion: "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).[6] Thus, we must consider whether the trial court's order

---

[6] "An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion," or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123-24 (Pa. 2021).

is supported by competent evidence. ***See In re Adoption of C.M.***, 255 A.3d 343, 358 (Pa. 2021). Appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. ***See Interest of S.K.L.R.***, 256 A.3d at 1123.

Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings. ***See*** 23 Pa.C.S.A. §§ 2101-2938. Subsection 2511(a) provides grounds for the involuntary termination of parental rights. If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then consider whether termination would best serve the child under subsection (b). ***See id***. § 2511(b). This Court need only agree with one of the grounds set forth in subsection (a) to affirm, provided subsection (b) is also satisfied. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). For this reason, our review centers on section 2511(a)(1) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> * * * *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental,

- 7 -

physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . ..

23 Pa.C.S.A. § 2511(a)(1), (b).

Regarding section 2511(a)(1), this Court has explained that "[i]f a father knows or has reason to know of a child's existence, he need not have conclusive proof of his paternity before the relevant six-month period begins. **In re Adoption of B.G.S.**, 245 A.3d 700, 707 n.2 (Pa. Super. 2021). Further:

> The most critical question in this matter is when Father knew or should have known of Child's existence, and the possibility that he was Child's father. While the plain language of [s]ection 2511(a)(1) does not require that a parent know, or have reason to know, of a child's existence before the relevant six-month period begins, our case law instructs that a court must consider the performance of a parent in light of what would be expected of an individual in circumstances in which the parent under examination finds himself.

**Id**. at 707 (internal citation and quotations omitted). We emphasize that, for purposes of subsection (a)(1),

> [a] parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. This [C]ourt has repeatedly recognized that parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical and emotional needs.

**In re C.M.S.**, 832 A.2d 457, 462 (Pa. Super. 2003) (internal citation, ellipses, and quotations omitted). **A parent cannot protect his parental rights by**

***merely stating that he does not wish to have his parental rights terminated. See id***. at 464. Thus, even where a child's custodial parent, or others, place obstacles to maintaining a party's contact with the child, that party must show some "reasonable firmness" in attempting to overcome those obstacles. ***See id***. Grounds arise for termination where the parent demonstrates a failure to take an active role in attempting to form a parental relationship with his child. ***In re E.S.M.***, 622 A.2d 388, 394 (Pa. Super. 1993).

Father argues the trial court erred in finding ground for termination of his parental rights pursuant to subsection (a)(1) because he did not evidence a settled purpose of relinquishing his claim to Child, but, rather, he did not know he was the father. ***See*** Father's Br. at 15. He argues CYF did not contact him until after it filed the termination petition, and the paternity test did not establish his paternity until July 2024. ***See id***. at 16. He asserts he tried to find out about Child, but he did not know Mother's whereabouts for much of the time, and she "told him nothing." ***See id***. at 17. He argues it was "nearly impossible for [him] to attempt to have a relationship with [C]hild." ***See id***. at 19.

The trial court considered Father's arguments and rejected them:

> I believe that the [CYF] met its [burden] pursuant to settled purpose under [s]ubsection [(a)(1)]. You knew that [C]hild was possibly your child and did nothing, and now it's a little too late for you to come forward to try to establish paternity. You could've done that at any time in the seven years that your child was born and you chose not to.

. . . We're appearing now on the termination hearing, and . . . the focus is really on what you did, and because you didn't do anything for seven years, you're held to your [in]actions during that period of time. . . ..

* * * *

It has been over six months since [C]hild was placed in the care of the agency. However, . . . despite having reason to know of [C]hild's birth, [F]ather has not involved himself in [C]hild's life and has never performed a single parental duty. Even when he was informed of [C]hild's existence by name, he did not seek her out, he did not inquire about paternity, he did not make any effort to take a place of importance in the child's life or even establish that he is in fact [C]hild's father, which is his excuse for not reaching out. He indicated that he didn't know he was the father. He wanted paternity to be established, but did not do anything affirmatively, which, by result then, means [F]ather made the affirmative decision to refuse to perform parental duties and absolutely evidenced a settled purpose to relinquish any claim to [C]hild due to his conduct. As a result, in all the years [C]hild has been alive, [F]ather has had no contact and no effort to have contact with his child. Even if he thought [C]hild was a possible child, if he had any interest, he could've reached out at any time to [M]other.

. . . [F]ather admitted that he was informed, before [C]hild was born, that he was likely the father . . ., and further, he testified that he in fact attended a prenatal appointment with [M]other.

. . . [Father] claimed he did not follow[-]up with [M]other about [C]hild because he'd been in and out [of] prison for the majority of [C]hild's life, with a four-month window between sentences. However, there's no dispute that he did have other methods of maintaining contact, specifically phone calls or through letters. He also had brief windows when he was between sentences. He had weekly contact with his mother, who in fact had contact with [Mother]. He didn't ask her about reaching out; he didn't ask her to do anything on his own behalf. Even when he was given additional time to show a genuine and sincere interest in [C]hild's life through continuance of these proceedings, he's not requested to see [C]hild, he has not asked to see her by Zoom,

by phone call, he's not sent her any letters, he's not done anything. In fact, he didn't even arrange for the paternity typing. That was arranged through [CYF].

It's obvious that he has no interest in [C]hild as far back as her birth, and he has made no effort to establish any bond with [C]hild. [C]hild does not recognize him. He wouldn't recognize her if he saw her, in fact, and it was reported that [C]hild and her half-siblings see [M]other's former paramours as the[ir] father[s] . . ..

\* \* \* \*

In consideration . . . of [F]ather's conduct and the absence that he elected to have with relation to [C]hild's life and expressing no interest in her, the [c]ourt finds sufficient evidence to terminate parental rights under [s]ubsection [(a)(1)].

N.T., 9/3/24, at 85-86, 95-98.

Following our review, we conclude the evidence supports the trial court's findings and that the court committed no abuse of discretion or error of law. The evidence of record shows that Father had reason to believe that Child was his, given he knew of Mother's pregnancy following the time when they had engaged in sexual relations, and he accompanied Mother to an ultrasound. From that time on, Father made no efforts to inquire about Child, ascertain her whereabouts, establish paternity, or otherwise show any interest whatsoever in her existence during her entire seven years of life. Even after he was reminded of Child's existence by CYF in April 2024, and following a CYS's subsequent filing of a termination petition in that same month, as well as confirmation of his paternity in July 2024, Father still took no steps whatsoever to reach out to Child or anyone else to evince an interest in Child, notwithstanding his ability to send free letters from prison and to have phone

calls with his court-appointed attorney. There are simply no facts of record to show that Father used any of his available resources, or exercised any "reasonable firmness," to attempt to establish a parental relationship with Child for her entire life, notwithstanding his assertion at the hearing that he desired to parent Child. *Cf*. *E.S.M.*, 622 A.2d at 394; *see C.M.S.*, 832 A.2d at 464. Thus, we conclude the trial court committed no error of law or abuse of discretion in finding grounds for termination of Father's parental rights under subsection (a)(1).

The trial court also found that termination was in Child's best interests. *See* N.T., 9/3/24, at 103-05.[7] Father purports to contests this finding in his statement of questions involved in this appeal. Before we consider the merits of Father's challenge to the trial court's section 2511(b) finding, we must first determine whether Father has preserved this issue. Our review of Father's brief discloses he engages in no meaningful discussion of section 2511(b) but instead suggests that we need not reach this issue, given, the trial court's alleged error in finding grounds for termination under section 2511(a)(1). *See* Father's Br. at 11. Because Father develops no argument vis-à-vis section 2511(b), we need not review the merits of this issue. *See In re*

---

[7] Section 2511(b) requires that the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). A biological connection is insufficient to establish a bond. *See In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008).

***M.Z.T.M.W.***, 163 A.3d 462, 466 (Pa. Super. 2017) (holding that challenges to section 2511(b) findings are waivable).[8]

Having found the record supports the trial court's finding of grounds for termination of Father's parental rights, and concluded the trial court committed no abuse of discretion or error of law, we affirm the decree involuntarily terminating Father's parental rights to A.R.M.M.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/07/2025

---

[8] Even if preserved, Father's section 2511(b) argument would be meritless. The trial court committed no error of law or abuse of discretion in determining that termination was in Child's best interests. As this Court has held, where a child does not recognize a parent, and that parent has had no, or almost no, contact with Child throughout the child's life, it is reasonable to infer that no bond exists, and the court may conclude that termination is in the child's best interests pursuant to section 2511(b). ***See Interest of M.V.***, 203 A.3d 1104, 1113 (Pa. Super. 2019).