J-S04030-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: F.I.A.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.T., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2960 EDA 2023 |

Appeal from the Order Entered October 31, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0002324-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: F.I.A.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.T., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2961 EDA 2023 |

Appeal from the Decree Entered October 31, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000209-2023

BEFORE: BOWES, J., STABILE, J., and LANE, J.

MEMORANDUM BY STABILE, J.: **FILED APRIL 1, 2024**

W.T. (Father) appeals the October 31, 2023 decree involuntarily terminating his parental rights to his biological daughter, F.I.A.T., born in October 2018. He also appealed the order entered on the same day changing

F.I.A.T.'s permanency goal to adoption.[1]  Upon review, we affirm the termination decree and dismiss Father's appeal from the goal change order as moot.

We glean the factual and procedural history of the above-captioned matters from the certified record.  The Philadelphia Department of Human Services ("DHS") first became involved with this family shortly after F.I.A.T. was born in October 2018, at which time J.F. ("Mother") and F.I.A.T. both tested positive for marijuana.  Application for Protective Custody, 10/11/18. At prior prenatal appointments, Mother tested positive for marijuana, cocaine, opioids, and benzodiazepines.  *Id.*  On October 11, 2018, DHS was awarded protective custody of F.I.A.T. and, at a shelter care hearing held the next day, the court determined F.I.A.T. should remain in the custody of the agency. Father appeared at the shelter care hearing and asserted himself as the biological father of F.I.A.T.  After an assessment of Father's home and conducting the appropriate clearances, on October 22, 2018, custody of F.I.A.T. was transferred to Father and the dependency petition discharged.

Thereafter, Father and F.I.A.T. moved to Colorado with his paramour, E.A., and her child.  Dependency Petition, 4/20/22, ¶ 5(d).  On or about October 8, 2021, Arapahoe County Department of Human Services ("ACDHS") in Colorado received an allegation that Father assaulted E.A., and that F.I.A.T.

---

[1] The parental rights of F.I.A.T.'s biological mother, J.F., were involuntarily terminated on October 31, 2023.  She did not file an appeal.  By separate decree entered the same day, the trial court also terminated the right of any potentially unknown father of F.I.A.T.

was present when it occurred. *Id.*, ¶ 5(e). When ACDHS visited the home, marijuana and cigarette smoke emanated from inside. *Id.* E.A. answered the door, but would not allow ACDHS into the home or to assess F.I.A.T.'s safety. *Id.* ACDHS observed a quarter-sized bruise below E.A.'s left eye and heard a man yelling from inside. *Id.* E.A. said it was not a good time, closed the door, then reopened the door and agreed to speak with ACDHS on another day. *Id.*

On October 18, 2021, ACDHS met with E.A. for a safety visit. *Id.*, ¶ 5(g). E.A. said she was moving back to Philadelphia and wanted information on domestic violence shelters. *Id.* On November 1, 2021, ACDHS went to the home to speak with E.A. *Id.*, ¶ 5(h). A man yelled from inside that E.A. was not there and refused to answer the door. *Id.* On November 8, 2021, ACDHS was notified that a domestic violence incident occurred between Father and E.A. *Id.*, ¶ 5(i). E.A. and her daughter were safe, but E.A. was unsure about F.I.A.T.'s safety. *Id.*

After another domestic violence incident, on December 6, 2021, E.A., her daughter, and F.I.A.T. went to a local hospital. *Id.*, ¶ 5(k). E.A. did not return to Philadelphia in November 2021, but was now planning to leave Colorado and did not know where F.I.A.T. would go. *Id.* On December 9, 2021, due to the ongoing safety concerns, F.I.A.T. was removed from the home and placed in the care of ACDHS. *Id.*, ¶ 5(l). ACDHS was unable to meet with Father or assess the home. *Id.*

On March 29, 2022, DHS received a general protective services ("GPS") report from ACDHS seeking to transfer the family's case because they believed Father returned or would be returning to Philadelphia. *Id.*, ¶ 5(m). ACDHS requested DHS to verify Father's status in Philadelphia before transferring the case. *Id.* On March 30, 2022, DHS met with Father at the home of paternal grandmother, T.T. *Id.*, ¶ 5(n). Father denied the allegations in ACDHS's dependency petition and claimed E.A. suffered from untreated mental health issues. *Id.* He left Colorado and returned to Philadelphia because he did not believe he would be reunified with F.I.A.T. *Id.* Father said he was searching for employment and was willing and able to care for F.I.A.T. *Id.*

On April 13, 2022, DHS contacted Father who said he was still searching for employment and housing. *Id.*, ¶ 5(o). On April 20, 2022, DHS filed an urgent dependency petition. On May 12, 2022, DHS accepted jurisdiction of the case from ACDHS, and the court deferred adjudication of dependency for further investigation. F.I.A.T. was residing in a foster home in Colorado and would be brought to Philadelphia as soon as possible.

F.I.A.T. was adjudicated dependent in June 2022 and placed in kinship care with maternal great aunt, S.F., where she has remained during the entirety of these proceedings.[2] N.T., 10/31/21, at 10. On May 30, 2023, DHS filed a petition to involuntarily terminate Father's paternal rights pursuant to

---

[2] S.F. also has custody of Mother's two other children, F.I.A.T.'s older half-siblings. N.T., 10/31/23, at 10.

23 Pa.C.S.A. § 2511(a) and (b).[3]   The trial court held a goal change and termination hearing on October 31, 2023, wherein DHS presented the testimony of the community umbrella agency ("CUA") case manager, Shante Atkins, and child advocate social worker, Roya Paller, and introduced the dependency docket as a stipulated exhibit.   N.T., 10/31/23, at 8.   Father testified on his own behalf.   *Id.* at 53-60.   The same day, the trial court entered a decree involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

On November 26, 2023, Father filed a timely notice of appeal and statement of errors complained of on appeal.   The trial court complied with Pa.R.A.P. 1925(a)(ii) explaining its reasoning, which largely referred to its on-the-record statements at the conclusion of the October 31, 2023 hearing. Upon application from Father, we consolidated the cases pursuant to Pa.R.A.P. 513.   Father raises six issues for our review:

1. Whether the Trial Court erred by terminating the parental rights of Appellant, W.T., under 23 Pa.C.S.A. § 2511(a)(1)?

2. Whether the Trial Court erred by terminating the parental rights of Appellant, W.T., under 23 Pa.C.S.A. § 2511(a)(2)?

3. Whether the Trial Court erred by terminating the parental rights of Appellant, W.T., under 23 Pa.C.S.A. § 2511(a)(5)?

4. Whether the Trial Court erred by terminating the parental rights of Appellant, W.T., under 23 Pa.C.S.A. § 2511(a)(8)?

---

[3] William Rice, Esquire, was appointed as legal counsel for the child.  N.T., 10/31/23, at 3.  James Demarco, Esquire, served as guardian *ad litem* for the child.  *Id.*

5. Whether the Trial Court erred by terminating the parental rights of Appellant, W.T., under 23 Pa.C.S.A. § 2511(b)?

6. Whether the Trial Court erred by determining it to be in the child's best interest to change the goal from reunification to adoption?

Father's Brief at 5-6.

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interest of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (internal citations omitted). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004) (citing *In re C.S.*, 761 A.2d 1197, 1199 (Pa. Super. 2000)).

Here, the trial court terminated Father's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *Id.* at 384. We begin our analysis with Section 2511(a)(2), which states:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental

care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). "The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021), *appeal denied*, 258 A.3d 1144 (Pa. 2021). We emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id.* "A parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties." *B.L.W.*, 843 A.2d at 387-88.

Father contends that DHS failed to prove by clear and convincing evidence that his conduct warranted termination under Section 2511(a)(2). Specifically, Father asserts that he "has made consistent weekly visits with the child throughout the life of the case, has employment and did an evaluation at the Wedge in June 2023. He is willing to remedy the issues that brought the child into care." Father's Brief at 17. We disagree.

The trial court identified Father's incapacity for purposes of Section 2511(a)(2) as the lack of compliance with his objectives and the continued concern for substance abuse and domestic violence. *See* N.T., 10/31/23, at 70-72. Father's permanency plan objectives essentially remained the same throughout the life of the case. Initially, his objectives were to (1) complete a full drug and alcohol screen and dual diagnosis assessment through CEU;

(2) report for random drug screenings; (3) provide proof of employment; (4) engage in housing and employment services through the Achieving Reunification Center ("ARC"); (5) provide proof of a medical marijuana card; and (6) continue with his mental health treatment. *Id.* at 23-24. He was initially scheduled to have weekly supervised visits at the agency or in the community.

The record demonstrates that Father was minimally compliant with his permanency plan objections and made minimal progress toward alleviating the circumstances that brought F.I.A.T. into care. Notably, ACDHS took custody of F.I.A.T. in December 2021, and Father moved back to Philadelphia while F.I.A.T. was in foster care in Colorado. N.T., 10/31/23, at 20. He told DHS that he returned to Philadelphia because he did not believe he would be reunified with F.I.A.T. Dependency Petition, 4/20/22, ¶ 5(n).

When DHS assumed jurisdiction of the case, Father had recently tested positive for marijuana, benzoylecgonine, and methamphetamine in Colorado. N.T., 10/31/23, at 28; Dependency Hearing, 6/28/22, Exhibit 1. Father was ordered to complete random drug screens throughout the life of the case. He took one early in the case and it was positive for marijuana. N.T., 10/31/23, at 30-31, 38. The record does not indicate whether Father completed a drug and alcohol screen and dual diagnosis assessment at CEU. However, Father completed an intake evaluation at Wedge Recovery Center on June 12, 2023,

but did not follow through with any recommendations.[4] *Id.* at 28-30. Further, Father never provided proof of a medical marijuana card. *Id.* at 31.

Father denied having a drug and/or alcohol problem. *Id.* at 56. However, he does admit to self-medicating, though he does not specify which substance he utilizes. *Id.* at 56-57. Father denied using cocaine and stated the positive drug test result was from using Orajel. *Id.* at 57. He testified that he completed four random drug screens total, but "kind of lost understanding" when he started at Wedge. *Id.* at 58. Father claims that once he started doing random drug screens at Wedge every weekend, he believed that satisfied the objective for random drug screens. *Id.* at 58. The records provided by Father's counsel do not support the claim that he provided weekly drug screens to Wedge. *Id.* at 58-59.

As for housing, Father was referred twice to ARC for housing and employment, and a third time for appropriate services, yet he only attended once and was discharged on September 7, 2023. *Id.* at 26-27. Father never secured stable housing in the Philadelphia area. *Id.* at 31-32. He explained that it is difficult to find housing in Philadelphia as a single father because "[t]hey're not helping me as fast as they're going to help a single mother." *Id.* at 61. Father provided no explanation for why he did not engage with the

_____

[4] Father was directed to complete an intake at Wedge Recovery Center and follow all recommendations on October 7, 2022.

ARC for assistance with housing. A few days prior to the termination hearing, Father mentioned that he had housing in the Harrisburg area. *Id.* at 31-32.

Although Father was consistent with visitation, it never progressed beyond supervised because of the lack of compliance with his objectives. *Id.* at 33-34. Ms. Atkins testified that initially, Father "had this attitude that he really didn't want to do what he was supposed to do," but eventually started making some attempts to comply. *Id.* at 39. "[H]e would go to the Wedge, or he would go try to get help, but he would not follow through. Like, he would go in for intake, but would not continue with services." *Id.*

Father blamed his lack of compliance on DHS:

Because if they gave me the correct paperwork, whereas though they broke down exactly what [Father] was supposed to be doing – they just was saying, "Do this, do this, do this." They never said, "This is what [Father's] supposed to be doing." They said, "You should do this," or "You should do that." They never said this was obligated for me to do, or else this would happen.

*Id.* at 55. He further testified that he was confused and unaware of his permanency plan objectives:

Honestly, I did not – I was confused at the beginning of this case, and also with being . . . a father and . . . a fiancé of someone right now, it's kind of hard to be trying to do that when I'm working to feed my child also, and feed my other kids.

Ain't no job paying the price that – I – I don't have a good job that really pays a lot of money, so, I have to figure it out.

* * * *

. . . [S]he did discuss, at the beginning of the case, like, things that I should do to be able to reunify with her. She said things

- 11 -

that would help me in my case. She never said that this would destroy my case.

She said, "If you go to this program, this program," this is how it was explained. She said, "Certain jo [sic] – certain things, if you don't do it, it could affect your case, but I'm not telling you you have to do anything, but if I was you, I – I would do X, Y, and Z."

It took a year for me to talk to one of my friends, and him say, "Bro, if she said – she advised you to do it, that means you need to do it." I didn't understand that. I suffer from mental problems and I'm also a little bit slow.

*Id.* at 59-61. Despite admitting that he suffers from mental health issues, Father never availed himself of the resources offered by DHS.

Based on the foregoing, Ms. Atkins opined that Father was not capable of providing a safe and stable home for the child. Additionally, Ms. Atkins has continued concerns about domestic violence in the home as Father denied it was a problem and did not avail himself of any resources. *Id.* at 37. Father claimed he recently obtained a protection from abuse order against E.A., but did not provide any proof. *Id.* There is no evidence that Father has remedied the issues that brought F.I.A.T. into care. *Id.* at 35.

Accordingly, the record demonstrates that Father's repeated and continued incapacity to comply with his permanency objectives due to his lack of responsibility, externalization of blame and continued concerns for substance abuse and domestic violence has caused F.I.A.T. to be without essential parental care, control or subsistence necessary for her physical and mental well-being. There is a difference between participating in the objectives and recommendations, and actual progress. Here, there was no

evidence that Father progressed despite the number of services he was provided. Thus, the conditions and causes of Father's incapacity and refusal cannot or will not be remedied. Therefore, the trial court did not abuse its discretion in terminating Father's parental rights pursuant to Section 2511(a)(2).

We now turn to Section 2511(b), which states, in pertinent part:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b). "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). This determination "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id.* at 1106.

Our Supreme Court has mandated that a Section 2511(b) analysis must include "consideration of the emotional bonds between the parent and child." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Thus, the court must determine whether the adverse impact of severing the parent-child bond "is outweighed by the benefit of moving the child toward a permanent home." *Id.* at 253.

> [B]y evaluating the impact of severance to determine if it will impose more than an adverse or detrimental impact, courts correctly refine their focus on the child's development and mental

- 13 -

and emotional health rather than considering only the child's "feelings" or "affection" for the parent, which even badly abused and neglected children will retain.

**K.T.**, 296 A.3d at 1110. "The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." **T.S.M.**, 71 A.3d at 267 (citing **In re K.K.R.-S.**, 958 A.2d 529, 535 (Pa. Super. 2008)).

However, "courts must not only consider the child's bond with the biological parent, but also examine the intangibles such as the love, comfort, security, and stability the child might have with the **foster** parent." **K.T.**, 296 A.3d at 1111 (emphasis in the original; internal citations and quotation marks omitted). Thus, courts should also consider factors that naturally arise due to the particular facts of a case, such as: (1) the child's need for permanency and time in foster care; (2) whether the child is in a pre-adoptive home and bonded with foster parents; and (3) whether the foster home meets the child's needs. **Id.** at 1113.

Turning to the merits of Father's appeal, he argues that the evidence was insufficient to terminate his parental rights because he was consistent with visitation and F.I.A.T. knows him as her biological father. Father's Brief at 19. We disagree.

Ms. Atkins testified that F.I.A.T. has a bond with Father. **Id.** at 41. However, she believes that the benefit of moving the child towards a

permanent and stable home outweighs the adverse impact of severing the bond. *Id.* Father has not shown that he is able to make proper and appropriate decisions to refrain from relationships that lead to domestic violence. *Id.* He has not completed anger management or gone to therapy for the domestic violence issues. *Id.* Without addressing those issues, Father is unable to provide a safe, stable and secure home for F.I.A.T. *Id.*

Roya Paller is a social worker assigned to the family and testified at the termination hearing. She interviewed F.I.A.T. on October 19, 2023. *Id.* at 49. F.I.A.T. defined 'adoption' as living with her mommy, who she identified as her foster mother. *Id.* at 49-50. Ms. Paller also informed F.I.A.T. that visitations with Father could stop if she were adopted. *Id.* F.I.A.T. "said she was okay with that because sometimes she gets scared that he's going to take her home." *Id.*

As previously noted, F.I.A.T. was placed with her maternal great aunt, S.F., who has custody of F.I.A.T.'s older half-siblings. *Id.* at 10. F.I.A.T. has been in her pre-adoptive home since June 2022, and looks to S.F. for love, protection and support, and S.F. meets all F.I.A.T.'s needs. *Id.* at 9, 13, 15. Initially, F.I.A.T. displayed some aggression, but S.F. and F.I.A.T. have continuously worked on those issues. *Id.* at 11. Ms. Atkins explained:

> The aunt did state that – and this was in the beginning, and also not that long ago, about when – just the – the physical part. . . . [W]hen [F.I.A.T.] gets upset, she will hit instead of talking – talking things out.

- 15 -

> So, the aunt . . . tries to . . . redirect [F.I.A.T.], as far as talking things out if she's upset; you don't hit, you don't hit your siblings, and stuff like that, you don't hide toys away if you get upset about different things, you don't do things like that.
>
> So, she tries to definitely redirect her behavior, but again, a lot of that is coming from where she was residing in Colorado, and what she witnessed.

*Id.* at 16. F.I.A.T. could not attend daycare this year due to incontinence issues. *Id.* at 14. The doctor recently ruled out any medical issues, and it was determined that the incontinence is a trauma response. *Id.* At the time of the hearing, S.F. was trying to find a therapist for F.I.A.T. *Id.* at 14-15.

Based on the foregoing, we find no abuse of discretion or error of law in the trial court's holding that termination was warranted pursuant to Section 2511(b). Accordingly, we affirm the decree terminating Father's parental rights.

We now turn to Father's separate challenge of the trial court's order changing F.I.A.T.'s permanency goal from reunification to adoption. Under Pennsylvania law, our decision above affirming the trial court's termination decree renders any challenge to the goal change order moot. *See In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa. Super. 2021); *see also In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect."). Accordingly, we dismiss Father's goal change appeal as moot.

Decree affirmed. Appeal from goal change order dismissed as moot.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/1/2024