J-A01045-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.G.W., A MINOR | : <br> : <br> : <br> : <br> : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.W., MOTHER | : <br> : <br> : <br> : <br> : <br> : <br> : | |
| | : | No. 2054 EDA 2024 |

Appeal from the Decree Entered July 8, 2024
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000142-2023

BEFORE: DUBOW, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED MARCH 17, 2025**

S.W. ("Mother") appeals from the decree involuntarily terminating her parental rights to her daughter S.G.W. (born in May 2017) ("Child").[1] We affirm.

In April 2023, Philadelphia Department of Human Services ("DHS") petitioned for the involuntary termination of Mother's parental rights to S.G.W. pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2) (5), (8), and (b). The trial court held an evidentiary hearing in July 2024, at which community umbrella agency ("CUA") case manager Elexus Church ("Ms. Church") and Mother testified. At the conclusion of the hearing, the trial court terminated Mother's parental rights.

---

[1] Child's putative biological father ("Father") obtained counsel who participated in the hearing and opposed termination based on potential downstream effects on Father. The trial court terminated Father's parental rights to Child at the conclusion of the hearing, but Father did not appeal or participate in the instant appeal.

The factual history of the case, gleaned from the certified record, is as follows. In December 2019, the court transferred temporary legal custody to DHS and placed Child in medical foster care through the supervising agency Children's Choice. Ms. Church, who was case manager for this case since 2020, explained that the family became involved with DHS because Child suffers from nephrotic syndrome,[2] she and her two siblings were residing with their grandmother ("Maternal Grandmother"), Mother was working and unavailable, and, consequently, many of Child's medical appointments were being missed and follow-up appointments with specialty providers were not being scheduled. *See* N.T., 7/8/24, at 27-28. Ms. Church described Child as being "medically neglected." *Id*.

In addition to nephrotic syndrome, Child has autism, for which she requires services and consistency with her receipt of services. *See id*. at 34. Child also has an independent education plan ("IEP") at school for her autism. *See id*. at 36. She also receives occupational therapy and speech therapy and has an "activities class, just to teach her how to communicate with . . . other children. And then emotional support." *Id*. at 46.

Throughout the life of the case, Mother's single case plan objectives included obtaining housing, providing employment information, to visit Child and remain in contact with her, and to sign releases and consents. *See id*. at

---

[2] This Court has noted that nephrotic syndrome is "an auto-immune disorder affecting the kidneys." *Krell v. Silver*, , 817 A.2d 1097, 1099 n.2 (Pa. Super. 2003).

30. Because Child is "medically needy," DHS also desired that Mother engage in Child's medical appointments. *See id*.

For the life of the case, Mother never participated in any of Child's services. *See id*. at 32. She participated in no medical appointments. *See id*. at 32-33. She also attended no IEP meetings. *See id*. at 48. Additionally, she provided no financial support for Child. *See id*. at 41.

Mother, who worked in a prison in New York state, resided on the prison campus, which did not permit children to be at the residence; thus, Child could not live with Mother. *See id*. at 38. Only in October 2023, nearly four years after Child was placed, and approximately six months after DHS filed the petition for involuntary termination of Mother's parental rights the preceding April, did Mother obtain housing that permitted the presence of children. *See id*. Mother's work schedule at the prison was 3:00 p.m. to 11:00 p.m., with some mandated shifts of 7:00 a.m. to 3:00 p.m. *See id*. at 70. Mother's residence is located an hour and twenty minutes from the prison at which she works. *See id*. at 38. Mother only identified, within the approximately sixty days preceding the hearing, a friend of hers who could provide support in caring for Child, *see id*. at 63, but that person had not responded to outreach by Ms. Church. *See id*. at 62.

Mother's visitation with Child has not been consistent over the life of the case, and she has had no regular contact with Child. *See id*. at 51, 52. From January 2023 (preceding the filing of the April 2023 termination petition) through July 2024, Mother visited with Child three times, and during the last

visit, Child's older sibling expressed concerns that Mother was putting too much responsibility on her to manage the details of their hotel stay and to care for her sister. *See id*. at 31-32. Mother has telephonic contact with Child approximately "once a month, if that." *Id*. at 35.

Ms. Church opined that reunification of Child and Mother concerned her because Mother "works extremely hard and long hours. [Child, s]he's a lot. In addition to her nephrotic syndrome, she also has autism. So she's just learning . . . her schedules. And . . . just the consistency of it all. Especially with the services she has." *Id*. at 34. Ms. Church explained that she did not believe Child could be safely reunited with Mother "[b]ecause of the safety concern with the distance of Mom, the house, the employer. Also, with the specialty providers. The Early Intervention that she's receiving right now. She'll be completely snatched away from all of that." *Id*. at 40. While Ms. Church rated Mother's compliance with her objectives as moderate, she testified that in the approximately fifty-five months that Child had been removed from Mother's care, Mother had not shown that she could provide the stability Child needs. *See id*. at 40, 61.

Additionally, Ms. Church opined that termination of Mother's parental rights would not irreparably harm Child. *See id*. at 41. She explained that while Mother and Child have a relationship, Child identifies her foster parents, who are not a pre-adoptive resource, as her caregivers and family, and, consequently, she does not depend on Mother for her medical or everyday needs. *See id*. at 41. Child does not look to Mother for satisfaction of her

parental needs. ***See id***. Rather, she looks to her foster parent when she's sick, hungry, or hurt. ***See id***. at 46. Her foster parent also takes her to medical appointments, provides financially for her, and ensured that Child is up to date with her medical, dental, and vision services. ***See id***. at 46-47. Child refers to her foster mother as "Mom," and Mother as "other mom." ***See id***. at 50, 73. Ms. Church elaborated on her opinion that termination of Mother's parental rights was in Child's best interests, so that Child could be freed for adoption, as follows:

> . . . [Child] needs a level of stability when it comes to just like the parent[] being home. Her caregiver at this time doesn't work. She needs definitely 24-hour supervision. Hands on supervision.
>
> When it comes to . . . her medical appointments, following up. With every . . . medical appointment[,] with her medications, insurance. She gets her medications twice a day on the clock.
>
> If not, she has a [flareup]. And she goes into the hospital. It's bad. So she just needs that attention, undivided attention, the support, the consistency.

***Id***. at 63-64.

Following the close of evidence, DHS, Child's legal counsel, Lisa Visco, Esq. ("Attorney Visco"), and the guardian *ad litem* ("GAL"), Michael Graves, Esq. ("Attorney Graves"), advocated in favor of termination. ***See id***. at 78.[3]

_____

[3] Attorney Visco indicated that she visited with Child and discerned that Child could not understand the concept of adoption, but Child indicated she wanted to stay with her foster parent. ***See*** N.T., 7/8/24, at 72; ***see also In re***
*(Footnote Continued Next Page)*

The trial court thereafter terminated Mother's parental rights pursuant to section 2511(a)(1), (2), (5), (8), and (b). Mother timely appealed, and both she and the trial court complied with Pa.R.A.P. 1925.

Mother raises the following issue for our review:

Did the trial court commit an error of law and/or abuse its discretion in terminating Mother's parental rights by finding the testimony presented by [DHS] was sufficiently competent evidence [and that grounds for termination were] supported by clear, direct, weighty and convincing facts?

Mother's Brief at 5 (unnecessary capitalization omitted).

Our standard of review is for an error of law or abuse of discretion: "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).[4]  Thus, we must consider whether the trial court's order is supported by competent evidence.  *See In re Adoption of C.M.*, 255 A.3d

---

*Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) (holding that appellate courts should engage in *sua sponte* review to determine if trial courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with 23 Pa.C.S.A. § 2313(a)).

[4] "An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion," or "the facts could support an opposite result."  *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.*  This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.  *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123-24 (Pa. 2021).

343, 358 (Pa. 2021). Appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *See Interest of S.K.L.R.*, 256 A.3d at 1123.

Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings. *See* 23 Pa.C.S.A. §§ 2101-2938. Subsection 2511(a) provides grounds for the involuntary termination of parental rights. If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then consider whether termination would best serve the child under subsection (b). *See id*. § 2511(b). This Court need only agree with one of the grounds set forth in subsection (a) to affirm, provided subsection 2511(b) is also satisfied. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). For this reason, our review centers on section 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * * *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental,

- 7 -

physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . ..

23 Pa.C.S.A. § 2511(a)(2), (b).

The grounds for termination under section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may include acts of refusal and incapacity to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021), *abrogated on other grounds by Interest of K.T.*, 296 A.3d 1085, 1110 n.23 (Pa. 2023). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017). The trial court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to cooperate with the agency or take advantage of available services during the dependency proceedings. *See In re S.C.*, 247 A.3d at 1105.

Section 2511(b) requires that the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Our Supreme Court has elaborated:

> . . . [T]he child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court

- 8 -

must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d at 1106 (internal citations, quotations, and footnotes omitted). Bond, permanency, stability, and all other intangibles are "all of 'primary' importance in the [s]ection 2511(b) analysis." *Id*. at 1109. In considering the affection which a child may have for his or her natural parents, this Court has stated that the affection a child harbors for parents does not necessarily constitute a bond, nor is a biological connection sufficient to establish that a bond exists. *See In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008). Further, this Court has clarified that it is "within the discretion of the [trial] court to prioritize the safety and security" of children "over their bonds with their parents[.]" *Interest of M.E.*, 283 A.3d 820, 839 (Pa. Super. 2022). Thus, we will not disturb such an assessment if the trial court's factual findings are supported by the record. *See id*.

In her combined argument section addressing section 2511(a), generally, and (b), Mother argues the trial court abused its discretion in terminating her parental rights to Child. She argues that the evidence shows she spoke with Child telephonically or virtually once a month; she is employed full-time; she participated in single case planning meetings telephonically and obtained appropriate housing and cooperated with Ms. Church in looking for local social services in the area. *See* Mother's Brief at 8-9. Mother highlights her testimony showing that she is familiar with Child's medical needs. *See*

*id*. at 9.  Mother additionally argues that because Child's foster parent is unwilling to adopt her, Child will have to move to a pre-adoptive home, and it would be traumatic to have the bond with her foster parent severed.  ***See id***. at 10.  For that reason, Mother argues that the rehabilitation of her bond with Child is preferable to Child having to form a bond with a new caregiver.  ***See id***. at 10-11.

The trial court considered Mother's arguments and rejected them.  At the hearing, the court concluded:

> . . . This case has been open since the adjudication now. It's been well over four years.
>
> * * * *
>
> When Mother is making representation[s] today [about her willingness to care for Child,] I did not find Mother credible.  Her own behavior throughout the more than four years, the life of the case, demonstrates that she has not made it a priority to care for [C]hild.
>
> I don't find that any additional time would change these circumstances.  Mother's compliance has not risen above moderate, and that's well after the time that the petitions were filed in this case.  She has not made time to see [C]hild. . ..
>
> * * * *
>
> I do find that there is a continued incapacity, abuse, neglect, or refusal or both [by] the bio[logical] parents and any unknown father . . ..  And that that situation has not been remedied. Mother was not able to provide any specifics . . . as to how she would have [C]hild cared for.  This is a significantly needy child.
>
> And the testimony from Ms. Church is that she needs 24[-]hour care and attention.  . . . [Mother] lives an hour and twenty minutes from her [place of employment].  There

is no indication how her friend . . . is going to alleviate that situation.

And I don't find that there was sufficient testimony to show that that situation has corrected itself, and Mother is ready to be reunified with [C]hild.

* * * *

Under 2511[(b)], there is no parent/child bond or relationship between [Child] and either of her biological parents . . .. While she knows who her mother is, she refers to her as her ["o]ther mother."

[Child] does not look to [M]other to meet any of her needs. And certainly could not even have that kind of a relationship with [M]other, as [M]other has not taken the time to spend any significant or consistent time with [C]hild . . ..

So I find that she would not suffer irreparable harm, and she does not look to her parents to meet any of her parental needs. By contrast, she's been looking to the resource parent. . .. And it's in her best interest to change the goal to adoption today.

N.T., 7/8/24, at 82-88.

Following our review, we conclude the trial court's decree is supported by the evidence and we discern no abuse of discretion or error of law. The record shows that Mother failed to address Child's medical and educational needs for over four years or participate in her medical appointments, IEP meetings, or other services; she provided no financial support; her contact with Child was inconsistent; she failed to procure suitable housing for years until after the filing of the termination petition; and though she represented to the trial court her willingness and ability to parent Child, she provided no specific information about how she would care for Child—and the trial court,

as the fact-finder found Mother incredible. The record thus supports the trial court's conclusion that Mother was incapable of parenting Child. *See In re S.C.*, 247 A.3d at 1104 (parental incapacity includes refusal to perform parental duties); *see also id*. at 1105 (trial court may reject a parent's untimely vow to follow through on necessary services). Additionally, the record supports the trial court's conclusion that Mother and Child have no parental bond, and it would not irreparably harm Child, but would rather be in Child's best interests, for Mother's parental rights to be terminated, and for Child to have an opportunity to be adopted by a caregiver capable of providing stability and tending to her developmental, physical, and emotional needs. *See In re K.K.R.-S.*, 958 A.2d at 535 (biological connection insufficient to establish a bond); *In re T.S.M.*, 71 A.3d at 267 (courts must consider the developmental, physical, and emotional needs and welfare of the child, including intangibles such as love, comfort, security, and *stability*).

For the foregoing reasons, we affirm the trial court's decree involuntarily terminating Mother's parental rights to S.G.W.

Decree affirmed.

Judge King joins this memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/17/2025