In the Matter of K.K.R.-S., K.M.R., K.A.R., Minors

Appeal of D.R., Natural Mother.

Superior Court of Pennsylvania.

Argued June 25, 2008.
Filed Sept. 29, 2008.

Jennifer B. Archer, Harrisburg, for appellant.

Jason P. Kutulakis, Carlisle, for appellee.

BEFORE: STEVENS, MUSMANNO and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 D.R. appeals from the Decrees terminating her parental rights to K.K.R.-S. (DOB 8/23/00), K.M.R. (DOB 11/14/03), and K.A.R. (DOB 1/31/06).

¶ 2 On November 14, 2003, appellant gave birth to her second child, K.M.R. Later that day, Dauphin County Children and Youth Services (CYS) received a referral from Harrisburg Hospital indicating appellant had admitted to using cocaine during the pregnancy. Laboratory testing later confirmed K.M.R. was born with cocaine in her blood stream. On January 7, 2004, the orphans' court held an adjudica-

tory hearing and determined K.M.R. and her older sibling, K.K.R.-S., were dependent. The two children were then placed in the care of their maternal grandmother, Jackie Wright. The court also ordered appellant to complete numerous service objectives including: 1) maintaining weekly contact with CYS; 2) completing drug and alcohol treatment, remaining substance free, and submitting to bi-weekly drug screens; 3) maintaining regular contact with K.K.R.-S. and K.M.R., and attending frequent supervised visits; 4) procuring and maintaining suitable housing; 5) procuring and maintaining a legal source of income; and, 6) providing for the children's medical and educational needs.

¶ 3 Appellant's contact with CYS throughout the remainder of 2004 was sporadic at best. Her whereabouts were unknown from January 14, 2004 through March 3, 2004, from April 16, 2004 through July 6, 2004, and again from September 1, 2004 through the end of the year. While appellant submitted to eight drug screens during 2004, she failed three of them. There is no evidence indicating appellant either obtained suitable housing or legal employment during 2004.

¶ 4 Appellant also failed to maintain contact with CYS during the first half of 2005. On June 13, 2005, following a detention hearing, CYS was granted legal custody of K.K.R.-S. and K.M.R; they remained in the physical custody of their grandmother. Appellant did not formally report to CYS until September of 2005, after discovering she was pregnant with K.A.R. On September 26, 2005, appellant was admitted to the in-patient drug treatment program at Vantage House. She remained in the program through completion on March 9, 2006, during which time she gave birth to K.A.R. During this period, appellant had regular visits with K.K.R.-S. and K.M.R. After being released from in-patient treatment, ap-

pellant attended some out-patient therapy and continued to visit K.K.R.-S. and K.M.R. at their grandmother's home. Appellant was also able to obtain stable Section 8 housing in Steelton upon her release from Vantage House. Unfortunately, appellant fell back into her old ways soon after taking these encouraging steps.

¶ 5 On April 18, 2006, CYS was informed appellant had abandoned K.A.R. at grandmother's home. Two days later, following a detention hearing, K.A.R. was placed with Radiah and Michael Hackley, K.A.R.'s maternal aunt and uncle. Less than a week later, appellant informed CYS she was abusing crack-cocaine and heroin again and, on May 2, 2006, the orphans' court held an adjudication hearing and found K.A.R. to be dependent. As a result, CYS was awarded legal custody of K.A.R., and the Hackleys were awarded physical custody. Three days later, appellant failed to appear for a scheduled visit with K.A.R., and for the next few months her whereabouts were unknown. On July 24, 2006, appellant contacted CYS by telephone to inform them she had obtained gainful employment, however, at a September 5, 2006, review hearing, appellant informed CYS she no longer was employed. Appellant then disappeared again.

¶ 6 CYS filed termination petitions on behalf of the three children on January 9, 2007. In February of 2007, CYS placed K.K.R.-S. and K.M.R. with the Hackleys after discovering grandmother had been allowing appellant to have unsupervised visits with the children. Termination hearings were conducted on July 2nd and July 11th of 2007. At the July 2, 2007, hearing, appellant testified she had been convicted of prostitution and placed on probation. She further testified she had violated her probation by using cocaine and, as a result, had been incarcerated prior to the termination hearing. More-

over, she stated she was pregnant with another child, had used cocaine during the pregnancy, and been incarcerated "at least five to six times" from November of 2003 to July of 2007. N.T., 7/2, 11/07, at 35.

¶ 7 On July 11, 2007, the court entered a "Decree of Termination" as to each of the three children; a timely notice of appeal followed. Appellant, as directed, filed a Rule 1925(b) statement, and the court issued an Opinion on November 9, 2007. *See generally,* Pa.R.A.P.1925, **Opinion in Support of Order.**

■■■ ¶ 8 The parameters of our review are well-defined:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re K.J.,* 936 A.2d 1128, 1131 (Pa.Super.2007), *appeal denied* —— Pa. ——, 951 A.2d 1165 (2008), *quoting In re B.L.W.,* 843 A.2d 380, 383 (Pa.Super.2004) (*en banc* ), *appeal denied* 581 Pa. 668, 863 A.2d 1141 (2004). The orphans' court is the sole arbiter of witness credibility and, if the court's findings are supported by competent evidence, we will affirm its decision, even if the record could support a contrary result. *Id.* at 1131–1132. The burden of proof is on the party seeking termination to produce clear and convincing evidence that such action is warranted. *Id.* at 1131.

The phrase "clear and convincing evidence" refers to testimony which is "so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id., citing In re J.D.W.M.,* 810 A.2d 688, 690 (Pa.Super.2002). Once an agency carries its burden of proof in proving termination is necessary, the orphans' court must conduct a distinct inquiry to determine whether the agency has produced clear and convincing evidence that termination would best serve the child's needs and welfare. *Id.* at 1134.

¶ 9 The orphans' court found CYS carried its burden of proof under the following statutory provisions:

> (a) **General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> · · ·

> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

> · · ·

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more

have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

Orphans' Court Opinion, Hoover, J., 11/9/07, at 7, *quoting* 23 Pa.C.S.A. § 2511, **Grounds for involuntary termination.** Appellant does not quarrel with the court's application of these provisions; rather, appellant contends the court erred in concluding termination best served the children's emotional needs and welfare pursuant to section 2511(b), **Other considerations,** which provides:

(b) OTHER CONSIDERATIONS.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

¶ 10 Specifically, appellant argues termination is not supported by competent evidence because the court failed to consider the effect of severing the bond between her and the children. In support of this argument, appellant points out that CYS never ordered a formal bonding evaluation and that the CYS case worker who testified at the July 2007 termination hearings, Christina Thierwechter, never observed appellant interact with K.K.R.-S. and K.M.R., and only observed appellant interact with K.A.R. on two occasions. Appellant's brief at 16–17. Conversely, CYS asserts the plain language of section 2511(b) does not require a bonding analysis and, further, even if one were required the bonding analysis is "at best, a subset of the emotional needs category established in § 2511(b) of the termination statute." Appellee's brief at 16.

¶ 11 Section 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered in determining "the developmental, physical and emotional needs and welfare of the child" under section 2511(b), *supra.* Fifteen years ago, our Supreme Court stated:

To render a decision that termination serves the needs and welfare of the child without consideration of emotional bonds, in a case such as this where a bond, to some extent at least, obviously exists and where the expert witness for the party seeking termination indicates that the factor has not been adequately studied, is not proper.

*In re E.M.,* 533 Pa. 115, 620 A.2d 481, 485 (1993). In analyzing the parent-child bond, the orphans' court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert. *See In re I.A.C.,* 897 A.2d 1200, 1208–1209 (Pa.Super.2006).

¶ 12 In this matter, the court considered whether a bond existed and found "scant, if any, evidence" that one did. Orphans' Court Opinion at 15. The court reviewed the CYS records and also considered testimony offered by two witnesses, Kevin and Theresa Smith, among others, both of whom testified to observing appellant interact with K.K.R.-S. and K.M.R. Kevin Smith testified appellant had a positive,

loving relationship with the children. N.T. at 112.

¶ 13 CYS, however, produced overwhelming evidence establishing appellant made no attempt to cultivate a bond with the children. K.K.R.-S. was born on August 23, 2000. Kevin Smith testified he was her primary caretaker for the first three years of her life, from approximately August of 2000 until August of 2003. N.T. at 111. This testimony was not refuted and about four months later, on January 7, 2004, K.K.R.-S. was removed from appellant's care. K.M.R. was adjudicated dependent less than three months after birth and placed in her grandmother's custody. From January 7, 2004, onward, appellant sporadically visited K.K.R.-S. and K.M.R. Indeed, the record discloses that the only period during which appellant cultivated a relationship with K.K.R.-S. and K.M.R. was when she was in in-patient rehabilitation between September 2005 and March 2006. K.A.R. was born on January 31, 2006. Within four months, appellant abandoned him at his grandmother's house, and thereafter, the court placed the baby with the Hackleys.

¶ 14 CYS became involved in this matter in November of 2003. From that point forward, appellant refused to maintain consistent contact with CYS; she abused narcotics, and was repeatedly incarcerated. She did not obtain stable housing, nor was she able to obtain a steady source of legal income, despite being given over three years to do so. Aside from vague and self-serving assertions, there is little evidence indicating appellant attempted to cultivate relationships with the children. At the July 2, 2007, termination hearing, appellant had difficulty remembering the children's birthdays. N.T. at 8–9. She was not certain whether K.M.R. attended school or daycare. *Id.* at 24. The evidence also establishes appellant failed to provide for the children's medical or educational needs. Orphans' Court Opinion at 5, *citing* N.T. at 58. The children have spent very little time in appellant's care over the course of their lives—with K.M.R. and K.A.R. having spent only a few months in appellant's care during infancy. The record is devoid of any evidence tending to indicate appellant had a positive effect on her children's lives. When asked why she should continue to have parental rights to her children, appellant herself testified "sometime it's too late." N.T. at 38. When asked how well she knew her own children, the only concrete answer appellant could muster was that K.K.R.-S.'s favorite movie was "Bring It On" and that K.M.R. "liked watching Disney Movies, like Finding Nemo." N.T. at 98. Given the evidence with which the orphans' court was presented, it is apparent appellant is contending a beneficial parent-child bond exists when CYS cannot prove a child has negative feelings for the parent and when a biological connection exists between the child and the parent. We disagree.

¶ 15 The appropriate manner in which to define the bond between parent and child in the context of a termination proceeding is set forth in the following passage:

> The bonding cannot be in one direction only—that of child to the parent—but must exhibit a bilateral relationship which emanates from the parents' willingness to learn appropriate parenting, anger management, drug rehabilitation and marital stability. It is inconceivable that a child's bonding to the parent, if it can be documented, will supervene failure to thrive, abuse reports ... domestic violence reports and removal of the children into foster care due to adjudications of dependency and termination findings....

*In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418–419 (Pa.Super.2003) (Tamilia, J., dissenting).

¶ 16 This passage relies on an immutable psychological truth. Even the most abused of children will often harbor some positive emotion towards the abusive parent. Nurturing such emotion can, and almost always will, result in further harm to the child, as this emotion necessarily leaves the child vulnerable. Once clear and convincing evidence is produced demonstrating a parent has failed to cultivate a bond with her children, we cannot then overturn the termination of her parental rights on the basis that an agency did not produce enough evidence to prove the children do not feel strongly about the parent—a showing which is inherently negative in the first instance. A child's feelings toward a parent are relevant to the section 2511(b) analysis. Nonetheless, concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. "The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *C.W.S.M., supra* at 418 (Tamilia, J. dissenting). Nor are we of the opinion that the biological connection between appellant and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. "The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood." *T.B. v. L.R.M.*, 874 A.2d 34, 44 (Pa.Super.2005) (Tamilia, J., concurring), *appeal denied* 586 Pa. 729, 890 A.2d 1060 (2005), *quoting Hoy v. Willis*, 165 N.J.Super. 265, 398 A.2d 109, 112 (1978), *quoting in turn* Joseph Goldstein, Anna Freud, & Albert J. Solnit, **Beyond the Best Interests of the Child** (1973).

¶ 17 Appellant herself testified the Hackleys take "good care of my kids" and "their needs ... are met...." N.T. at 21. Witness Thierwechter, who testified to observing the children interact with the Hackleys, portrayed the relationship between the children and the Hackleys as follows:

> I see a very loving relationship. I believe mostly because of the status of the preadoptive parents being the maternal aunt and uncle, the children have been able to be around them essentially their entire lives so they have a very strong bond. I've seen discussions between them. You can tell that they talk to each other a lot and that they do a lot of things together as a family.

N.T. at 64. Moreover, the evidence of record establishes that K.K.R.-S. had experienced behavioral problems before being placed with the Hackleys, but that these problems mostly subsided after the placement. N.T. at 77–79. It must also be remembered that the Hackleys are the children's maternal aunt and uncle. The very notion that we would interfere with the children's full assimilation into a positive environment only to expose them to a life of drug abuse, prostitution, promiscuity, neglect, and crime simply because appellant is dissatisfied with the quantum of evidence CYS produced in attempting to establish a negative, i.e. the children do not have affection towards their mother, and/or simply because there is a biological

relationship between appellant and the children, is repugnant. Moreover, our case law does not require such action as this case is not one where a bond obviously exists. Terminating the connection between appellant and the children will not "destroy something in existence that is necessary and beneficial". *See In re C.P.,* 901 A.2d 516, 523 (Pa.Super.2006). No abuse of discretion or error of law has been committed.

¶ 18 Decrees affirmed.[1]

---

1. The Motion to Quash Appellant's Brief, In Particular Section I of Appellant's Argument, is denied as moot.