J-S03031-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: W.R.B., III, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: W.B., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1304 MDA 2025 |

Appeal from the Order Entered September 2, 2025
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s): 2024-00072

| | | |
|---|---|---|
| IN THE INTEREST OF: K.R.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: W.B., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1305 MDA 2025 |

Appeal from the Order Entered September 2, 2025
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s): 2024-00073

| | | |
|---|---|---|
| IN THE INTEREST OF: L.S.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: W.B., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1306 MDA 2025 |

Appeal from the Order Entered September 2, 2025
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s): 2024-00074

BEFORE:  DUBOW, J., BECK, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED: APRIL 1, 2026**

W.B., Jr. ("Father"), appeals from the orders which terminated his parental rights to his three biological children: W.R.B, III (born in 2015); K.R.B. (born in 2017); and L.S.B. (born in 2019) (collectively "the Children"). After careful review, we affirm.

The trial court set forth its findings of fact related to these matters, as follows:

> The Children were removed from the parents['] care on November 25, 2022[,] due to the deplorable condition of the home and significant drug use by parents. Criminal charges were filed against the parents for endangering the welfare of children because of the November 25, 2022, circumstances. The date of dependency officially was December 9, 2022. The Children were adjudicated dependent on January 5, 2023. The Children remained at the home of Joan and Eric Alexis, maternal grandparents.
>
> The Children were initially placed in foster care. They were then placed with maternal grandparents . . . on an emergency basis. After a short time, there were concerns reported to [the Lackawanna County Office of Youth & Family Services ("Agency")] about the placement with the Alexis family and about interactions in the community and at doctor appointments. The Children were then moved to traditional foster home placements in early 2023. The Alexis' were not approved for placement by Families United.
>
> [The Children's natural mother died from a drug overdose on October 15, 2023.]
>
> A caseworker visited the Alexis home on November 30, 2024. The [maternal] grandparents became hostile toward the caseworker and blocked her from leaving the house. The police were called to resolve the unlawful restraint of the caseworker. Because of this incident and because of the extreme lack of cooperation, in fact obstructionism with offering the Children services, the maternal grandparents became a remote placement possibility.

It is against regulations to approve a foster family with one of the parents living with them, and Father was living with his in-laws. (N.T.[,] 8/25/25[, at] 66-67). It would not be against regulations for Father to be living with the Alexis family if he were ready for the Children to be returned to him. (N.T.[,] 8/25/25[, at] 68). He has never achieve[d] such readiness.

The Pennsylvania Superior Court determined that Joan Alexis did not have standing to intervene in the dependency proceedings. ([*See*] No. 345 MDA 2024, dated 8/29/24)[.]

The Agency set goals in January 2023 for the return of the Children to the parents. The goals included sober living; maintain mental health of parents; keep the Children healthy; have a clean and safe home; adhere to an educational plan for the Children; and provide proper supervision for the Children. The permanency plans have included those criteria plus the parents to provide a protective role for the Children.

The maternal grandparents initially had to follow the goals set for the parents, plus undergo a mental health evaluation. Living in the maternal grandparents home are maternal grandparents; Father; [Father's daughter, I.B.] (age 11[]); and 96[-]year[-]old maternal great-grandmother. An uncle lives in an adjoining apartment.

The final decision by the Agency was that the Children could not be placed in the home of Joan and Eric Alexis because of the November 30, 2024, incident and because the Agency felt they could not work with her. Joan Alexis did not appeal the decision. (N.T.[,] 8/25/25[, at] 61).

The Children all have special needs that require intense supervision. The maternal grandparents were not providing proper supervision and were hostile toward the caseworkers who were trying to provide support and assistance.

A single foster home was initially tried for all three Children. However, because of their special needs, the Children were placed in separate foster homes, with [the] opportunity to have regular contact with each other.

The Children are thriving in their foster homes. They have bonded with the foster parents who can provide all the Children's needs, including their special needs. All the homes are pre-adoptive homes.

Maternal grandmother has been a major factor in this case. She sincerely loves these Children. However, her actions have been an incredibly disruptive force against the Children growing, maturing, and overcoming their special needs. She has made inappropriate comments to the Children about when and where they will live, confusing the Children and undermining the Agency's efforts to reunite them healthily. Her actions have been a barrier to reasonable educational, medical, and therapeutic services that the Agency has been attempting to provide to the family and the Children.

Maternal grandmother has clearly attempted to be a surrogate for Father in these proceedings and in helping to raise these Children, even though this court and the Superior Court have found that she has no legal standing in this case. During the hearings, this court allowed an attorney to sit in as ostensibly a private attorney for Father. It became clear during the hearing that the attorney was advocating for maternal grandmother. The attorney became unnecessarily disruptive and was removed from the courtroom. Remarkably, the attorney sneaked back into the courtroom toward the end of the hearing.

Father has two other children who live in Carbon County in foster care. There are charges pending against him for endangering the welfare of children.

[On December 6, 2024, the Agency filed petitions to terminate Father's parental rights to the Children. The trial court conducted a termination hearing on August 25, 2025.]

[At the termination hearing,] Father was reluctant to testify on his own behalf. His counsel stated that he was not in a mental state to testify. After encouragement by the court, he did testify. Father testified he has schizophrenia, bipolar type 2, social anxiety, and general anxiety. He testified that he would "stop there" but said he takes all his medications. (N.T.[,] 8/25/25[, at] 178-[]79) . He stated he was sober since December 9, 2022. (N.T.[,] 8/25/25[, at] 188-[]89). He has seen the Children one hour every two weeks since they were in foster care, although he

misses many visits, mainly due to lack of transportation. He makes some money by being a Door Dash worker. He is on disability due to his mental status (possibly social anxiety) and scoliosis. He sees a psychiatrist and takes medication.

Father has been living with maternal grandmother. He cannot find or afford to find another place to live, although his efforts are minimal at best. Father has been unreasonably resistant to cooperating to secure medical and educational services. Court orders became necessary. Father has attended most supervised visits with the Children recently. However, he has minimal rapport with the Children and the visits tend to be chaotic. Father has a minimal bond with the Children. To the extent he has a relationship with the Children, it is driven by maternal grandmother who is using him as a surrogate for her.

Father has made no progress in reaching the goals set for reunification. There is no evidence that he can or will do that in the immediate future or ever.

Despite the fact that L.[S.]B.'s medications are helping [him], if Father had custody, he said he would probably take [L.S.B.] off the medication and get a second opinion "not from Big Phama" (N.T.[,] 8/25/25[, at] 195).

The Children spoke to the court about their preferences. None of the Children had mature reasons for not staying with the foster parents where they have been for well over a year. W.[R.]B. III would prefer maternal grandmother, although he feels safe with his foster parent. K.[R.]B. want[s] to stay with her foster mother, although she would like to visit Father and maternal grandmother. L.[S.]B. calls his foster parents "Mom and Dad." Their preferences have changed back and forth somewhat. Thus, the [guardian *ad litem* ("GAL")] and separate legal counsel were appointed for the Children. However, the Children clearly feel safe and comfortable with the foster parents and have bonded with them.

[The] Agency has made reasonable efforts to assist Father in his efforts to achieve his objectives. However, he was not cooperative for a long time and has not achieved those objectives. There is no evidence that he can adequately care for these Children who have significant needs and require specialized care.

At the time of the [termination] hearing, the Children had been in the care of the Agency for 26 months.

It is in the best interest of the minor Children that parental rights be terminated because termination would best serve the developmental, physical, and emotional needs and welfare of the Children.

The minor Children ha[ve] been removed from the Father by the court and more than 12 months have elapsed from the removal and placement and the conditions which led to the removal continue to exist and termination of parental rights would best serve the needs and welfare of the child.

The GAL agrees that termination of parental rights is supported by the facts and the law and is in the Children's best interests.

The Agency witnesses were very credible.

Trial Court Opinion, 10/29/25, at 3-7 (paragraph numbering and unnecessary capitalization omitted, some capitalization added).

On September 2, 2025, the trial court entered separate orders terminating Father's parental rights to the Children. Father filed separate notices of appeal from the termination orders,[1] as well as concise statements

---

[1] Father initially included all three docket numbers on each of his notices of appeal, in violation of **Commonwealth v. C.M.K.**, 932 A.2d 111 (Pa. Super. 2007). However, upon directive by this Court, Father filed amended notices of appeal which included only the docket number for the termination order at issue.

of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).[2]  The

trial court thereafter authored an opinion pursuant to Rule 1925(a)(2)(ii).

Father raises the following issues for our review:

A. Whether the trial court erred as a matter of law and/or manifestly abused its discretion in determining the Agency presented sufficient evidence to satisfy the grounds for termination of Father's parental rights under sections 2511(a)(2), 2511(a)(5) and/or 2511(a)(8) of the Adoption Act?

B. Even if this Court determines the Agency presented sufficient evidence to satisfy the grounds for termination of Father's parental rights under sections 2511(a)(2), 2511(a)(5) and/or 2511(a)(8) of the Adoption Act, whether the trial court nevertheless erred as a matter of law and/or manifestly abused its discretion in determining termination of Father's parental rights is in the best interest of the minor children, W.R.B., III, K.[R.]B., and L.[S.]B.?

C. Has there been a strong enough bond established between Father and minor [C]hildren, W.R.B., III, K.[R.]B. and L.[S.]B., which would make termination of parental rights not in the [C]hildren's best interest?

Father's Brief at 11-12 (unnecessary capitalization omitted).

In addressing Father's challenge to the termination of his parental

rights, we are guided by the following standard of review:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence.  When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record.  Where the

_____

[2] The trial court also entered goal change orders, which changed the Children's goals from reunification to adoption.  Father did not appeal from the goal change orders.

trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support.

Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations and quotation marks omitted).

The involuntary termination of parental rights is governed by section 2511 of the Adoption Act, *see* 23 Pa.C.S.A. §§ 2101-2938, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *M.E.*, 283 A.3d at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the trial court determines the petitioner has established grounds for termination under any one of these subsections by clear and convincing evidence, the court then assesses the

petition pursuant to section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b).

Here, the court found that the Agency established grounds for termination under section 2511(a)(1), (2), (5), (8), and (b). *See* Trial Court Opinion, 10/29/25, at 8. In order to affirm, we need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b). *See In re B.L.W*., 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).[3] Given this latitude in our review of a termination order, we confine our analysis to the court's decision to terminate under section 2511(a)(8) and (b), which provide as follows:

> **(a)   General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * * *

---

[3] We note that Father only challenges the trial court's findings that the Agency established the criteria specified by sections 2511(a)(2), (5), and (8). Father does not present any challenge to the trial court's determination that the Agency established the criteria specified by section 2511(a)(1).

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), and (b).

In weighing the factors related to a decision on the termination of parental rights:

[C]ourts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, . . . the result, all too often, is catastrophically maladjusted children. In recognition of this reality, . . . our society's approach to dependent children . . . require[es] vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes.

***In re T.S.M.***, 71 A.3d at 269.

In his first issue, Father purports to challenge the trial court's findings in relation to, *inter alia*, section 2511(a)(8). To satisfy section 2511(a)(8), the petitioner must show three components: (1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. ***See In re Adoption of J.N.M.***, 177 A.3d 937, 943 (Pa. Super. 2018).

- 10 -

Unlike other subsections, section 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). Further, the Adoption Act prohibits the court from considering, as part of the section 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).

Instead, the relevant inquiry regarding the second prong of section 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *See In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Although the application of section 2511(a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that led to the removal of the child, this Court has explained the urgency involved:

> [B]y allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [eighteen] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

- 11 -

Finally, although section 2511(a) focuses generally on the parent's behavior, the third element of subsection (a)(8) centers on the child's needs, thereby encompassing the needs and welfare analysis typically reserved until the trial court's section 2511(b) analysis. Nonetheless, while both section 2511(a)(8) and section 2511(b) direct us to evaluate the needs and welfare of the child, they are distinct in that we are required to resolve the analysis relative to section 2511(a)(8) prior to addressing the needs and welfare of the child as proscribed by section 2511(b). **See In re E.J.C.**, 335 A.3d 1222, 1231 (Pa. Super. 2025).

Father presents no argument relating specifically to section 2511(a)(8). Instead, he generally asserts that termination was not appropriate under any subsection of section 2511(a) because the Agency "failed to demonstrate by clear and convincing evidence that Father is unable to remedy the conditions which necessitated the removal of the Children." Father's Brief at 39 (unnecessary capitalization omitted). According to Father, he "has remedied the conditions which led to placement, *i.e.*, he has continuously maintained his sobriety all throughout these proceedings, since his arrest [o]n December 9, 2022." *Id*. (emphasis omitted).

Father asserts that he has remained sober since his arrest in 2022, and has made significant progress from the time he was released from incarceration. Father indicates that he has successfully completed inpatient rehabilitation, and that all of his drug screens have been negative. Father

claims that he is attending counseling and maintaining his mental health. Father points to testimony in the record regarding his participation in group therapy.

Notwithstanding these assertions, Father acknowledges that to achieve reunification with the Children, he was tasked with several goals and objectives, not merely to remain sober and to work on his mental health. In this regard, Father concedes that his objectives for reunification with the Children consisted of the following: (1) live a sober lifestyle; (2) maintain his mental health; (3) keep a clean and safe home for the Children; (4) provide for the safety and well-being of the Children; (5) provide proper supervision and protection for the Children; (6) ensure the Children remain physically healthy including routine medical, dental, and eye health; and (7) advocate for the Children's educational needs. *See* Father's Brief at 25.

Other than remaining sober and working on his mental health, Father does not argue that he has reached any other goals or satisfied any other objectives required for reunification with the Children. Instead, Father attempts to provide various reasons for his failure to accomplish his remaining goals and objectives.

In this regard, Father argues that the Agency did not use reasonable efforts to reunite Father with the Children. Father indicates that during his incarceration, he was only able to see the Children weekly via Zoom, and that during his inpatient rehabilitation, he was unable to see the Children at all.

Father asserts that staring in July 2023, following his completion of inpatient rehabilitation, he was only allowed to see the Children once per week for two hours. Father relates that the length of the visits were shortened in August 2023, from two hours per visit to one hour per visit, and their frequency was reduced from weekly to biweekly. According to Father, this schedule did not facilitate substantial and meaningful bonding between Father and the Children. Father also points out that there were many barriers to his visits with the Children, including lack of staff, geographical distance (K.R.B. had a very far placement), the Children's vacations, and illnesses of either the Children or a parent.

With respect to the visits that he did have with the Children, Father points to the testimony of Agency caseworkers, Danielle Taylor ("Caseworker Taylor"), Lisa Kanavy, and Michele Reese, who related that all the visits went well, and that Father interacted appropriately with the Children. Father highlights that during these visits, he would "play with the children, ask them questions . . . became more involved as time went by . . . and the C[hildren] would 'enjoy the time with him . . . specifically K.[R.]B. and W.R.B., III.'" Father's Brief at 32. Father indicates that he would provide the Children with food during the visits, such as McDonald's, and he brought presents for the Children at Christmas and baskets filled with candy and toys at Easter.

Regarding Father's objective to keep a clean and safe home for the Children, Father claims that he "hit roadblocks when attempting to obtain

- 14 -

other housing outside of what his former mother-in-law provided." Father's Brief at 36. According to Father, "[a]t every turn, he was stonewalled by one individual or organization or another." *Id*. Father indicates that he "applied to 'Carbondale Housing, Scranton Housing, and Lackawanna County Housing,' which are all government funded housing." *Id*. at 36-37. Father submits that, "[a]t every attempt he was denied." *Id*. at 37[4]

With respect to Father's objectives to ensure the Children remain physically healthy, including routine medical, dental and eye health, and to advocate for their educational needs, he claims that he is "not informed of a lot of appointments . . . I [call] Doctor to find out . . . and they [tell] me they can't give me any information." Father's Brief at 35-36. According to Father, "[C]aseworker Taylor would advise Father not to contact her but the school or Doctor." *Id*. at 36. Father claims that "there was a letter written by the Agency informing . . . W.R.B., III's school, not to inform Father regarding W.R.B., III's education as 'Father is not involved.'" *Id*. Father maintains that,

---

[4] Father asserts that "the housing provided by maternal grandmother was never deemed by the Agency as physically unsafe or unsuitable for habitation by Father and his Children. The sole complaint was maternal grandmother resided in the home." Father's Brief at 37 (unnecessary capitalization omitted). However, as explained by the trial court, the Children have separate special needs which require intense supervision and specialized care; and the maternal grandparents were not providing proper supervision. **See** Trial Court Opinion, 10/29/25, at 4. The trial court went on to explain that, although "[i]t would not be against regulations for Father to be living with the Alexis family if he were ready for the [C]hildren to be returned to him[,] [h]e has never achieve[d] such readiness." *Id*.

- 15 -

even if he had "reached out for more information regarding W.R.B., III's education, which he did on numerous occasions, the Agency made it impossible for him to get any information whatsoever . . . [and] blatantly thwarted Father's attempts to be involved with the Children's education and medical conditions on numerous occasions." *Id*. (unnecessary capitalization omitted).

The trial court considered Father's challenge to its findings in relation to section 2511(a)(8) and determined that it lacked merit. The court reasoned:

> The primary issue is whether after over twenty-six (26) months of placement, the conditions that led to removal persist, and whether the conditions can be remedied within a reasonable period of time. The best interests of the three Children are a prime consideration. The court finds that the conditions that led to placement persist and cannot be reasonably remedied within a reasonable time. It is in the Children's best interest to terminate parental rights.

> \* \* \* \*

> Father's parental rights must terminated under section[] 2511([8]) . . .. Father has failed to perform parental duties in excess of [twelve] months. He has performed almost no parental duties. There is little to no chance that he will remedy his lack of parenting. The conditions that led to the Children's removal from the home continue to exist after twenty-six (26) months, and there is no reasonable prospect that they will be remedied.

> Father's testimony is very weak and not credible about his ability now, in the past, or in the future to provide a safe and stable environment for the Children. He has no plan. While his journey in recovery is commendable so far, there is a void in his actual plans to care for the Children. His plan appears to allow maternal grandmother to care for the Children. He is her surrogate. Not only is that not a plan, maternal grandmother has proven that although she means well, she cannot properly take care of these Children and address their separate special needs.

- 16 -

Her criminal obstructionism and myopic view of what is in the Children's best interest and welfare is counterproductive to their best interest. There is a tragic component to this case, since she sincerely cares for these Children. She cannot see that she is a major roadblock to their development.

Importantly, Father's plan for housing stability, safety, basic needs of the Child[ren], and improved parenting skills are fragile plans at best. This is after two years. . . .

After two years, the Father's promise alone of self[-]sufficiency is not doing these Children any good. They need stability and hope. After years, Father provides neither hope nor stability, nor safety for these Children. Father gives no solid assurances that he will be able to provide proper safety, security, guidance, and care for the Children.

* * * *

In this case, Father has failed to perform parental duties. He has been a passive father, at best. He and Mother had devolved into significant drug use, which ended tragically for Mother and for these children and the family. Although he has made commendable efforts to stay sober, he has fallen woefully short in providing hope or fulfilling a promise that he can be a safe, nurturing parent to these Children who have various degrees of special needs. The Children need stability and safety, not hope without action.

Trial Cout Opinion, 10/29/25, at 7, 8-11 (some capitalization added).

Based on our review, we conclude that the Agency presented clear and convincing evidence that termination of Father's parental rights to Children was warranted under section 2511(a)(8). As explained above, to satisfy section 2511(a)(8), the Agency was required to establish: (1) that the Children have been removed from parental care for at least twelve months; (2) that the conditions which led to the removal or placement of the Children

still exist; and (3) that termination of Father's parental rights would best serve the needs and welfare of the Children. *See J.N.M.*, 177 A.3d at 943.

Here, the record reflects that the Children had been removed from parental care for twenty-six months at the time of the termination hearing. The Children were removed from the home in November 2022 due to Father and Mother being in a "state of incapacitation" due to their ingestion of controlled substances, and the home being in a "deplorable condition," with an old diaper on the floor containing feces, and old food on the table, counters, floor, and walls. N.T., 8/25/25, at 20-21. The Children were officially placed in care on December 9, 2022, and adjudicated as dependent on January 9, 2023. *See id*. at 21. The termination hearing took place on August 25, 2025. *See id*. Thus, there is no dispute that that the Agency satisfied the first requirement of section 2511(a)(8) because the Children had been removed from the care of both parents for at least twelve months.

The record further reflects that that the conditions which led to the removal or placement of the Children still exist. As explained above, section 2511(a)(8) requires the consideration of whether the conditions that led to removal have been remedied, and whether reunification is *imminent* at the time of the termination hearing. *See In re I.J.*, 972 A.2d at 11. On the record before us, at the time of the termination hearing Father's reunification with the Children was not even a possibility, let alone imminent.

With respect to the status of Father's progress with his goals and objectives for reunification with the Children, the Agency concluded that, overall, Father was minimally compliant and made minimal progress towards his goals and objectives. N.T., 8/6/25, at 70. At the termination hearing, when asked whether the conditions which led to the removal of the Children from their parents had been remedied, Caseworker Taylor responded, "absolutely not." *Id*. at 79.

Caseworker Taylor noted that Father was required to have three drug screens per week and that, since the initial permanency review hearing, Father has missed 138 screens. *See id*. at 71. While Father submitted to approximately thirty-six screens, which were negative for substances, the caseworker noted Father's "very long history of missed screens" as well as "a very long history of . . . very strategically being able to mask his substance use from the [A]gency and other sources." *Id*. at 72. Caseworker Taylor observed that "[Father] has a very significant history of substance use, not just in this case, . . . but in previous dependencies and in other cases in other counties with his other children." *Id*. at 80.

With respect to Father's mental health, Caseworker Taylor testified that father "has a very, very significant history of mental health and psychosis that have led to inpatient hospitalizations," and "has verbalized to [the Agency] in previous dependencies that he's unable to properly provide for the care of the [C]hildren due to his mental health." *Id*. at 80.

With respect to the requirement that Father provide the Children with suitable, safe, secure, and stable housing, Caseworker Taylor relayed that, as of the termination hearing, "[Father] does not have appropriate housing." *Id*. at 80. Father initially had housing which was neither safe nor stable, from which he was evicted, and he thereafter moved into a hotel room with his sister and another man, which was not a safe or appropriate place for the Children. *See id*. at 32, 73. Caseworker Tayler indicated that an Agency housing worker tried to provide housing support for Father and a housing referral was submitted; however, Father was discharged from that service after he failed to comply with the recommendations of the housing worker. *See id*. at 73.

The record additionally reflects that Father has been minimally involved with the Children and has not demonstrated that he can ensure that the Children remain physically healthy through routine medical, dental, and eye care, nor has he advocated for the Children's educational needs. Caseworker Taylor explained that W.R.B., III has been diagnosed with oppositional defiance disorder, attention deficit hyperactivity disorder ("ADHD"), and has a history of inpatient hospitalizations. *See id*. at 37. He has been prescribed several medications, including Clonidine, Melatonin, Ritalin, and Risperdal. *See id*. K.R.B. has been diagnosed with unspecified trauma disorder and ADHD. *See id*. She has been prescribed the medication Quelbree. *See id*. L.S.B. came in to care as non-verbal, and has been diagnosed with autism

and unspecified trauma disorder. *See id*. at 38. He has been prescribed medications, and is receiving medication management services, play therapy services, and behavioral therapy services. *See id*.

Caseworker Taylor explained that Father "had been encouraged to participate in all treatment needs that were scheduled [for the Children] and he had been provided contact information for all of the Children's providers across mental health and physical health and education[,] and encouraged to make contact with all of those providers and to keep up-to-date information." *Id*. at 130. Caseworker Taylor testified that "[Father] was invited to every meeting," and that the meetings occurred "via Zoom" or by "telephone." *Id*. at 114-15. However, Father's participation in the Children's therapy and other meetings, including school meetings, visits, mental health therapies, *etc*., was "inconsistent," with Father attending only thirty-five of 118 meetings. *Id*. at 111.

The Agency also had difficulty getting other consents from Father for the care and assistance that the Children need, requiring caseworkers to "pester [Father], call him, show up at the home and try to get him to respond to [the Agency's] requests." *Id*. at 40. The Agency even sent emails to Father which included his attorney in an effort to get Father to respond to the Agency's requests. *See id*.

As a result of Father's inaction, the Agency caseworkers have advocated for the Children's physical and emotional needs, educational needs, and

medical care. The Agency caseworkers took the steps for L.S.B. to undergo necessary dental surgery. ***See id***. at 39. The Agency caseworkers took the steps for L.S.B. to be reevaluated after his IQ score seemed lower than his caseworkers felt it should be, given how intelligent they thought him to be. ***See id***. L.S.B. also has a history of evictions from daycare and educational placements due to his exhibited behaviors. ***See id***. at 41-42. The Agency caseworkers worked to get L.S.B. evaluated, and prescribed a low dose of medication to help minimize his exhibited behaviors, and to help with the social and educational components of L.S.B.'s development. ***See id***. at 41, 43. Father opposed any medication for L.S.B., despite his physician providing compelling reasons for the need for the medication, including "the implications of being ostracized in the classroom and how those effects could be very, very longstanding." ***Id***. at 42. Ultimately, due to Father's opposition to any medication for L.S.B., Agency caseworkers took the extreme step of seeking and obtaining a court order for such medication. ***See id***. at 42, 44. Caseworker Taylor explained that, since L.S.B. has been on his low dose medication, he is doing well, is calmer in school, more interested in interactive play, more affectionate in the resource home, and is following his social goals. ***See id***. at 44.

When Mother died, Agency caseworkers made special arrangements for Father to come to the clinic where W.R.B., III was receiving treatment, so that Father could tell W.R.B., III in person of his mother's passing. ***See id***. at 47-

48. However, Father cancelled the first visit and, when it was rescheduled, failed to attend the second visit. *See id*. at 48. When the caseworker tried to call Father, he did not answer his phone. *See id*.

When asked if reunification with the Children was Father's top priority, Caseworker Taylor responded, "[a]bsolutely not." *Id*. at 158. The caseworker explained that Father's goals and objective were made very clear to him in the family service plan, and his failure to attend visits with the Children "was a choice he made." *Id*. at 158. She further explained that, "[w]hen [Father] moved into his current place of residence [with maternal grandparents], he understood, this is a barrier to reunification." *Id*. She continued, "[w]hen [Father] chose not to provide [drug] screens, those were [his] choices." *Id*. at 159. Caseworker Taylor emphasized that Father made "choices not to follow through with [his goals and objectives]." *Id*. She concluded by stating that she "do[es]n't see that [Father] presently has the capacity to reunify with the [C]hildren," and that "to have [them] wait for [Father] to eventually perhaps have the capacity and/or willingness to do so, would only be to their detriment." *Id*.

In sum, we conclude that the record reflects that the Agency presented clear and convincing evidence that: (1) the Children have been removed from parental care for at least twelve months; (2) the conditions which led to the removal or placement of the Children still exist; and (3) that termination of Father's parental rights would best serve the needs and welfare of the

Children. *See J.N.M.*, 177 A.3d at 943. While Father has made progress in attempting to address certain of his own mental health needs, he has not attended to the vital needs of his minor Children, including their physical, psychological, medical, emotional, educational, health, housing, and other essential needs. Instead, those needs have been addressed by the Agency caseworkers and the foster parents who are currently caring for the Children, and who want to adopt them. As explained above, a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. *See R.J.S.*, 901 A.2d at 513. Thus, although Father may love the Children, a court cannot and will not subordinate indefinitely the Children's need for permanence and stability to Father's claims of progress and his hope to provide such essentials for them at some distant point in the future. *See id*. Accordingly, as the trial court's determination that the Agency satisfied the requirements for termination under section 2511(a)(8) by clear and convincing evidence, and we discern no abuse of discretion or error of law, Father's first issue merits no relief.

Having determined that the trial court properly found that termination of Father's parental rights was appropriate under subsection 2511(a)(8), we now consider whether termination is in the Children's best interests pursuant to subsection 2511(b). In his second issue, Father challenges the trial court's finding that the Agency established that termination of Father's parental rights to Children was warranted under section 2511(b).

Section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." ***In re Adoption of J.M***., 991 A.2d 321, 324 (Pa. Super. 2010). "Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." ***In the Interest of K.T.***, 296 A.3d 1085, 1105 (Pa. 2023). This determination should not be applied mechanically, but must be made on a case-by-case basis, wherein "the court must determine each child's specific needs." ***Id***. at 1106. The child's emotional needs and welfare include "intangibles such as love, comfort, security, and stability." ***Id***.

"Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered in determining 'the developmental, physical and emotional needs and welfare of the child' under section 2511(b)." ***In re K.K.R.-S***., 958 A.2d 529, 533 (Pa. Super. 2008).

Moreover, to the extent there is any bond between the parent and child, the court must consider whether, in the context of all these factors, the parental bond is "necessary and beneficial" to the child. ***K.T.***, 296 A.3d at 1109. It is only a necessary and beneficial bond that should be maintained when section 2511(b) mandates the child's needs and welfare are of primary

importance.  ***See id***.  As section 2511(b) directs, courts must evaluate whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare, and this evaluation involves considering the effect of severing a child's bond with her parent.  ***See id***.; ***see also In re T.D.***, 949 A.2d 910, 920-23 (Pa. Super. 2008) (affirming the termination of parental rights where obvious emotional ties existed between child and parents, but parents were either unwilling or unable to satisfy the irreducible minimum requirements of parenthood, and preserving their parental rights would prevent child from being adopted and attaining permanency).

Importantly, while a child's feelings toward a parent are relevant to the section 2511(b) analysis, to conclude that a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound.  ***See K.K.R.-S***., 958 A.2d at 535.  Indeed, "if a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent." ***Id***.  Accordingly, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." ***Id***.  "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is

nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." ***In re N.A.M***., 33 A.3d 95, 103 (Pa. Super. 2011) (*citing **K.K.R.-S**., 958 A.2d at 533-36).

Further, the trial court must always consider "whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***K.T.***, 296 A.3d at 1106. Termination of parental rights is intended to prevent children from growing up in an indefinite state of limbo, without parents capable of caring for them, and at the same time unavailable for adoption by loving and willing foster families. ***See id***. at 1111. It is for this reason courts must not only consider the child's bond with the biological parent, but also examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent. ***See id***.

Father argues that, even if the Agency established one of the statutory grounds to support the termination of his parental rights under subsection (a), it failed to demonstrate the best interests of the Children would be served by terminating Father's parental rights "***at this time***." Father's Brief at 41 (emphasis in original). Father asserts that "the Children certainly have an irreplacable [*sic*] bond not only with Father, but also with each other and their grandparents." ***Id***. (unnecessary capitalization omitted). Father notes that the Children lost their mother, and argues that "now tearing apart this family would certainly not be in the best interests of any child, and the best interests of the Children must be taken into account in making this determination

whether termination of Father's rights is appropriate." *Id*. (unnecessary capitalization omitted). According to Father, "there was no proper exploration of the consequences of severing any bond between the Children, identified through Agency's testimony." *Id*. at 41-42 (unnecessary capitalization omitted).

The trial court considered Father's challenge to its findings related to section 2511(b) and determined that it lacked merit. Initially, the trial court considered whether there is a bond between Father and the children and determined that there is no bond. As the trial court explained, "Father's lack of action and commitment has essentially severed any substantive parental bond that he may have had with the [C]hildren. There is no parental bond." Trial Court Opinion, 10/29/25, at 10. The trial court additionally explained:

> [Section] 2511(b) provides that "[t]he court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." Not only has Father failed to perform parental duties for well over two years[, i]t is not in the best interest of these [C]hildren to deny them permanency, stability, comfort, safety, proper care, and hope.

*Id*. at 11-12.

Based on our review, we conclude that the trial court's ruling in regard to section 2511(b) is supported by clear and convincing evidence of record. Initially we note that Father's assertion that his parental rights should not be terminated *at this time* because the Children lost their mother does not advance his case. The Children's mother died in October 2023, as a result of

an overdose of illegal drugs. *See* N.T, 8/25/25, at 19. At the time she passed away, the Children had been removed from their parents' care for almost one year. In the wake of her death, the Children were left with only one living biological parent, *i.e*. Father, who has not provided for the Children's developmental, physical, and emotional needs and welfare. As explained above, a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. *See R.J.S.*, 901 A.2d at 513. Nor can the child's life be placed on hold until the parent feels there is a better time to assume his or her parenting responsibilities. *See id*. Instead, our trial courts work under statutory and case law that contemplates only a ***short period of time*** in which to complete the process of either reunification or adoption for a child who has been placed in foster care. *See id*.

With respect to the existence of a bond between the Children and Father, the Agency asked Father to participate in a bonding assessment; however, Father did not do so. *See id*. at 65. Although Father initially cited transportation barriers, a caseworker encouraged Father to make an appointment and assured Father that either she or one of her coworkers would get Father to the bonding assessment appointment, emphasizing the importance of the assessment. *See id*. Nevertheless, Father "did not see fit to follow through with [the bonding assessment]." *Id*. at 66. Father ultimately "indicated he did not feel it was necessary." *Id*. at 68. Caseworker

Taylor saw no evidence of a bond, and indicated "there's not a bond that I've recognized between each of the three [C]hildren and the [F]ather." *Id*. at 77, 78. She concluded by stating that, if the trial court were to terminate Father's parental rights to the Children, she did not believe that it would cause substantial harm to any of the Children. *Id*. at 60.

Moreover, the Agency provided testimony that all of the Children are thriving in their placements. *See* N.T., 8/6/25, at 58, 61. The Children are "very bonded with their resource parents[, t]he resource parents are very bonded with [the Children,] and have been wonderful advocates for them." *Id*. at 61. W.R.B., III has several significant mental health diagnoses. *Id*. at 148. He has had several failed placements due to his extreme behaviors, including defiance, threatening statements, hyperactivity, and violence to himself and others. *See id*. at 61. W.R.B., III has exhibited violence to himself, violence to others, homicidal ideations, suicidal ideations, lack of impulse control, general defiance, and his behaviors have led to several mental health evaluations and inpatient hospitalizations. *See id*. at 148-49. His current foster parent is a wonderful and supportive advocate for him who "adores him," and wants to adopt him. *See id*. at 58-59, 148-49.

With respect to K.R.B., she is "incredibly bonded" to her foster mother and has indicated that it is her desire to remain with her foster mother. *See id*. at 60. In return, the foster mother has indicated that she "would be absolutely delighted to adopt [K.R.B.]." *Id*. K.R.B. has explicitly stated that

she wishes to be adopted and does not with to return to the care of Father. *See id*. at 66.

L.S.B. "came into care largely non-verbal." *Id*. at 146. Grunting "was his primary mode of communication," and when he could not be understood, "it would become a tantrum." *Id*. L.S.B. has had "a few bumps along the road," but his current resource parents have "maintained their advocacy for him and they will adopt him." *Id*. at 61-62. Unlike prior foster parents, who lacked the resilience necessary to manage L.S.B.'s needs and services, his current foster parents have exhibited such resilience and are willing to be a permanent resource for him. *Id*. at 146-47. L.S.B. "refer[s] to and look[s] to his resource parents as his mother and father and responds to them as such." *Id*. at 66, 147.

Based on the above, we conclude that the record provides clear and convincing evidence which supports the trial court's determination that the termination of Father's parental rights would best serve the developmental, physical, and emotional needs and welfare of the Children. Accordingly, Father's second issue merits no relief.[5]

_____

[5] Although Father raised three issues in his statement of questions involved, he only addressed his first two issues in the discussion section of his brief. Thus, as Father provided no discussion for his third issue, it is waived. *See* Pa.R.A.P. 2119(a) (requiring appellants to support their claims for relief with "discussion," including "citation of authorities as are deemed pertinent"); *see also J.J. DeLuca Co., Inc. v. Toll Naval Associates*, 56 A.3d 402, 411 (Pa. Super. 2012) (holding that an issue on appeal is waived where the appellant
*(Footnote Continued Next Page)*

In sum, because the trial court's orders terminating Father's parental rights to W.R.B., III, K.R.B. and L.S.B. under subsection 2511(a)(8) and (b) are supported by clear and convincing evidence of record, and we discern no error of law or abuse of discretion, we affirm the termination orders.

Orders affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/1/2026

---

fails to develop argument of trial court error or provide pertinent supporting authority).